# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

ROSANN WILLIAMS, et al.,

     Plaintiffs,

v.                                  Civil No. 03-1195 WJ/ACT

W.D. SPORTS N.M., INC., et al.,

     Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS BY PLAINTIFF HUNTER

THIS MATTER comes before the Court pursuant to Defendants' Motion for Summary Judgment as to All Claims by Kaye Hunter [Docket No. 123].  Having reviewed the submissions of the parties, and being fully advised on the applicable law, I find the motion will be granted in part and denied in part for the reasons that follow.

## BACKGROUND

The following is a summary of undisputed facts, facts deemed admitted or facts considered in the light most favorable to plaintiff.

Before delving into the facts specifically relevant to this Motion for Summary Judgment, the Court will give a brief overview of the case for the purpose of introducing the relevant parties. Defendant W.D. Sports N.M., Inc. d/b/a The New Mexico Scorpions (W.D. Sports) is a professional hockey team that plays in Albuquerque, New Mexico.  At all times relevant to this case, Defendant William Douglas Frank was the president of W.D. Sports.  Defendant Patrick J. Dunn was the General Manager (GM) of the hockey team in the Spring of 2001 and became head

coach in April 2002.[1]  Dan Burgers replaced Dunn as GM in April 2002 when Dunn became head coach.  Defendant Tyler Boucher was assigned in July 2001 to assist in sales.  He eventually became Assistant to the President.  Defendant Bruce Levine was hired as comptroller, CPA and lawyer after all but one plaintiff, Plaintiff Marquart, had left the organization.

Plaintiff Kathryn Hunter began working for the Defendant Scorpions in May 2001 as a receptionist or Administrative Assistant.  Ms. Hunter subsequently became responsible for the team's box office and was paid $19,000 per year.  During her employment with W.D. Sports, Defendant Frank flew Hunter and her husband to an All-Star game.  Frank also gave Hunter money for her car.

Defendant Boucher was permitted to take merchandise from the team store.  He was given free or discounted tickets.  During the league convention in the spring of 2001, the male staff members went out together, and the female staff members were not invited.  Female staff members were generally expected to work from 8:30 to 5:30.  One male staff member chuckled at this and said "we'll see about that."  Some of the women felt they were treated unequally when it came to taking a lunch break.  Defendant Frank took Defendant Dunn and another male employee on a trip to Las Vegas.  None of the female staff were taken on such a trip.  Male staff and players were welcome to join Defendants at strip clubs.  Defendant Frank expressed concern in his deposition that it was improper for female staff to go to ordinary nightclubs with the players in their off duty hours.  After Ms. Hunter's employment with W.D. Sports ended in March 2002, a man took over Ms. Hunter's responsibilities in the box office and was paid a salary of $19,000 per year.

---

[1]At some time subsequent to the events in this case, Mr. Dunn transferred to Texas.

In March 2001, before Ms. Hunter was employed by W.D. Sports, Ms. Hunter saw Defendant Dunn and asked if he would become the GM if Defendant Frank bought the team. Defendant Dunn told her he expected to get the job so long as he got Defendant Frank "ass on the side."   One of the hockey players had earned the nickname "The Dominator" by having a lot of shut-out games.  After Dunn became the GM, he suggested to Ms. Hunter that he should be named "The Dominator" instead of the hockey player because he was being "shut out" by his wife at home.  On another occasion, Dunn told Ms. Hunter a limerick about a man wining and dining a woman until she passed out then laying her down, on the ground, spreading her legs, and practicing putting.

Dunn and Boucher often referred to women as "cougars"[2] and "donkeys."  Men were also referred to as "donkeys."[3]  One day, Dunn called Hunter into his office and asked why another female employee was such a "bitch," then rocked his hips back and forth in his chair and stated, "what she needs is a lot of this."   Hunter heard Dunn telling a story about a meeting in which someone said Dunn did not have the balls to do something.  According to Dunn's story, he dropped his pants to prove he had balls.  Dunn told stories at staff meetings and around the office about pole dancing naked in a hot tub and lying to his wife about it and about "giving it" to a

---

[2]According to Plaintiff, this term referred to older women whom the men found attractive in spite of their age.

[3]According to Plaintiff, this term has negative female connotations, and when used with regard to a man has additional negative connotations because he is being referred to as a woman.

"chink dancer" at a night club in Dallas that he went to with Defendant Frank.  Hunter heard

Dunn refer to women as "slits"[4] and "peelers."[5]

Hunter felt there was a limit to what she could say to Dunn about his comments because

he was her boss.  She did react to some of his comments with what she considered gentle

reprimands.  For instance, Hunter would respond to some of Dunn's comments by saying "Pat."

She responded to his comment about his wife shutting him out by asking, "What do you think

Izzy [his wife] would think about this?"  When he told the limerick, she asked, "Is there anything

more I need to know about this?"  When he referred to another employee as a bitch and made

sexual motions in his chair, she looked down and shook her head.  Ms. Hunter did eventually tell

Defendant Frank that the name-calling was not right and there should be a more businesslike

atmosphere.

Defendant Boucher also made a plethora of comments in Hunter's presence or within her

hearing.  At a staff party at Plaintiff Moira Daly's house, Boucher made gestures pretending he

was fondling a woman's breasts.  Boucher made sexual advances to Plaintiff Williams and Plaintiff

Daly.  Boucher and Dunn made oral sex motions with their mouths and made jokes about oral

sex.  Boucher and Dunn discussed a female job applicant who had posed for Playboy magazine.

In the office, Boucher complained to Hunter about his wife not having sex with him.  He also

discussed his inability to understand why someone would marry a "peeler" because "you can see it

all for free."  After making a ticket sale to some women, Boucher referred to the women as "fat

puck bunnies."  Other employees often overheard Boucher refer to female employees as "cunts,"

---

[4]Plaintiff interprets this term as referring to the female genitalia.

[5]This term refers specifically to female exotic dancers.

"bitches," and "fat asses."  Boucher and Hunter had a confrontation one time.  Boucher screamed at Hunter that she was a "fat fucking bitch" or a "fucking bitch."  Hunter responded by saying, "I'm not your fucking dog."  Hunter called Defendant Frank to complain about this confrontation.

At some time subsequent to the confrontation between Boucher and Hunter, Boucher had a similar confrontation with Plaintiff Williams during a staff meeting at which Hunter, Dunn and Frank were present.  Boucher apparently called Ms. Williams a "fucking bitch" and a "fucking liar."  Frank ultimately assured Hunter that things would change at the end of the season - he would tighten things down and "get certain employees under control a little bit more."  However, several co-workers later approached Hunter to inform her that Frank had announced at a meeting an intention to get rid of the "fucking bitches."  Hunter had a final confrontation with Boucher over complimentary tickets.  According to Hunter, Boucher lit into her.  When Hunter went to Dunn about it, she asked, "it's never going to change, is it?"  Dunn responded by shrugging his shoulders.  All told, Hunter asserts that Boucher called her a "bitch," "fucking bitch," "fat fucking bitch," or some related derogatory term forty to fifty times over the course of the season.

No one in the office ever made actual sexual advances toward Ms. Hunter, and no part of her job was ever conditioned on acquiescing to requests for sexual favors.  However, Ms. Hunter asserts that her employment was conditioned on accepting a hostile environment in that she was required to be an audience for sexual gestures and boasting.

Hunter and several other Plaintiffs filed a Complaint against Defendants that included twenty-six counts.  Hunter's claims included claims for gender discrimination disparate treatment under Title VII and the New Mexico Human Rights Act (NMHRA); claims for gender discrimination sexual harassment under Title VII and the NMHRA; claims for gender

discrimination hostile work environment under Title VII and the NMHRA; claims for retaliation under Title VII and the NMHRA; a claim for aiding and abetting under the NMHRA; a claim of intentional infliction of emotional distress; a claim under the Equal Pay Act; claims for breach of contract, breach of implied contract, and breach of the covenant of good faith and fair dealing; a claim for retaliatory discharge; and claims for false light, defamation, civil conspiracy, and interference with a business advantage.

Defendants filed the instant Motion for Summary Judgment arguing that Hunter's equal pay and disparate treatment claims must fail because there is insufficient evidence that male staff doing equal work were paid more than Ms. Hunter or had more generous conditions of employment. Defendants urge they are entitled to summary judgment with regard to Hunter's sexual harassment claims because there is no evidence of quid pro quo sexual harassment, and Hunter cannot come forth with sufficient evidence to establish her hostile work environment claims. Defendants ask for summary judgment with regard to Hunter's retaliation claims because she cannot show a causal connection between any protected activity and any adverse action. Defendants contend they are entitled to summary judgment with regard to Hunter's contract claims because there is no evidence of any employment contract between Defendants and Hunter. With regard to Hunter's retaliatory discharge claim, Defendants urge that Hunter cannot show that she was discharged or that she was discharged for an activity or refusal protected by New Mexico public policy. Defendants assert that Hunter's claim for interference with a business advantage must fail because Hunter has no evidence of a prospective business advantage and because she has no evidence of anything done by Defendants to interfere with any prospective business advantage. Defendants argue they are entitled to summary judgment with regard to

Hunter's claims for defamation and false light because any statements made were opinions, and any statements that were statements of fact were true.  Additionally, Defendants argue that Hunter cannot show damage to her reputation.  With regard to Hunter's claims for civil conspiracy and aiding and abetting, Defendants contend that Hunter cannot show any concerted action, common design or agreement.  Defendants assert that Hunter's claim for intentional infliction of emotional distress must fail because it is a component of damages rather than an independent claim, and she cannot show sufficiently extreme or outrageous behavior on the part of the Defendants to support the claim.

**LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The burden of showing an absence of a genuine issue of material fact falls upon the moving party.  See Adler v Wal-Mart Store, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  However, when the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by pointing out to the Court that there is an absence of evidence to support the nonmoving party's case.  Celotex Corp. v Catrett, 477 U.S. 317, 322-23 (1986); Adler, 144 F.3d at 671.  The nonmoving party must then go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial sufficient to support a verdict for the nonmovant.  Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  All reasonable factual inferences must be drawn in favor of the nonmoving party.

Seamons v Snow, 206 F.3d 1021, 1026 (10th Cir. 2000); Curtis v Oklahoma City Public Sch. Bd.

of Ed., 147 F.3d 1200, 1214 (10th Cir. 1998).

**DISCUSSION**

I.    PLAINTIFF HUNTER'S EQUAL PAY ACT CLAIM, CLAIM OF INTERFERENCE
      WITH BUSINESS ADVANTAGE, CONTRACT CLAIMS, CLAIMS OF
      RETALIATION AND RETALIATORY DISCHARGE, AND DEFAMATION AND
      FALSE LIGHT CLAIMS.

      Plaintiff Hunter's Response to the Motion for Summary Judgment indicates that she

consents to the dismissal of her Equal Pay Act claim, her claim of interference with business

advantage, her contract claims, her claims of retaliation and retaliatory discharge, and her

defamation and false light claims.  Accordingly, Defendants are granted summary judgment with

regard to Counts twelve (XII), thirteen (XIII), eighteen (XVIII), nineteen (XIX), twenty (XX),

twenty-one (XXI), twenty-two (XXII), twenty-three (XXIII), twenty-four (XXIV) and twenty-

six (XXVI), and Hunter's claims in these counts are dismissed.

II.   PLAINTIFF'S REMAINING GENDER DISCRIMINATION CLAIMS

      Plaintiff's remaining Title VII claims include Count six (VI) for gender disparate

treatment, Count seven (VII) for gender sexual harassment, and Count eight (VIII) for gender

hostile work environment.  Plaintiff's remaining New Mexico Human Rights Act (NMHRA)

claims for gender discrimination include Count nine (IX) for gender disparate treatment, Count

ten (X) for gender sexual harassment, and Count eleven (XI) for gender hostile environment.

      As an initial matter, the Court must determine whether anything differentiates these claims

from one another in light of Plaintiff Hunter's allegations.  See, Meritor Sav. Bank v. Vinson, 477

U.S. 57, 65 (1986) (Hostile environment sexual harassment is actionable under Title VII's

prohibition against sex discrimination).  Courts have interpreted Title VII to prohibit two types of sexual harassment:  quid pro quo sexual harassment and hostile work environment sexual harassment.  Hirschfeld v. NM Corrections Dep't, 916 F.2d 572, 757 (10th Cir. 1990).  Quid pro quo sexual harassment involves a conditioning of tangible employment benefits upon the submission to sexual conduct.  Hicks v Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir. 1987).  Hostile work environment harassment occurs "where [sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating hostile or offensive working environment."  Meritor Sav. Bank, 477 U.S. at 65.

Plaintiff Hunter alleges hostile work environment as a separate claim from sexual harassment.  From the facts alleged, supported and argued with respect to the Motion for Summary Judgment, there is no doubt that Hunter intends a claim for hostile work environment sexual harassment.  In her response to the motion for summary judgment, Hunter appears to argue that her claim of sexual harassment is distinct from her claim of hostile work environment because, even though her employment and benefits were not conditioned on sexual demands, her employment was conditioned on being an audience for sexual gestures and boasting.  This is simply another way of saying that she was exposed to a hostile work environment.[6]  Nothing in the facts alleged in the Complaint with regard to Plaintiff Hunter or the arguments made or supported by Plaintiff Hunter indicates that she has a claim for quid pro quo sexual harassment.  Accordingly, Hunter's only sexual harassment claims are for hostile work environment, and her

---

[6]The terms "quid pro quo" and "hostile work environment" are relevant to Title VII litigation to the extent that they "illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general."  See Burlington Ind., Inc. v. Ellerth, 524 U.S. 742, 760-62 (1998).

separate claims for sexual harassment in Counts in VII and X are superfluous in light of her claims for hostile environment in Counts VIII and XI. Therefore, Hunter's claims in Counts VII and X are dismissed.

There are two types of employment discrimination. There is disparate treatment discrimination which occurs when an employer treats an employee less favorably than others on the basis of that employee's race, gender or some other protected characteristic. Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993). There is also disparate impact discrimination which occurs when a facially neutral employment practice has a greater negative impact on a protected class of employees and the practice is not justified by a business necessity. Id. Clearly, Hunter's claims of hostile environment sexual harassment are brought under the disparate treatment theory of employment discrimination. Thus, to the extent Hunter's employment discrimination claims are based on a hostile work environment, Hunter's disparate treatment claims in Counts VI and IX are superfluous in light of her claims in Counts VIII and XI. Hunter argues that, in addition to the hostile environment, she was treated differently than male employees because she was paid less and because men received more generous conditions of employment including special perquisites and a more flexible code of conduct. Thus, Hunter's disparate treatment claims in Counts VI and IX will be analyzed only on the basis of the alleged unequal pay and unequal benefits and terms of employment.

A.    Plaintiff's Claims of Disparate Treatment in Counts VI and IX

The three-stage McDonnell Douglas burden shifting analysis applies to claims of discrimination under Title VII when no direct evidence of discrimination exists. See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1315-16 (10th Cir. 1999) overruled on other grounds by

10

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  At the first stage, the plaintiff must

prove a prima facie case of discrimination.  Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir.

1999).  Plaintiff establishes a prima facie case by showing that (1) she is a member of a protected

class; (2) she suffered an adverse employment action; (3) she was qualified for the position at

issue; and (4) she was treated less favorably than others not in the protected class. Sanchez v.

Denver Pub. Sch., 164 F.3d 527, 531 (10th Cir.1998) (citations omitted).  With regard to Title

VII equal pay claims, a plaintiff makes a prima facie case of discrimination by showing that she

occupies a job similar to that of higher paid males.  Sprague v. Thorn Americas, Inc., 129 F.3d

1355, 1363 (10th Cir. 1997).  If the plaintiff satisfies her burden and makes a prima facie showing,

the burden shifts to the defendant to produce a facially legitimate, non-discriminatory reason for

its actions.  Id.  If the defendant articulates a legitimate, nondiscriminatory reason for its actions,

the burden shifts back to the plaintiff to show that the defendant's proffered reason for the action

is a pretext for discrimination.  Id.

There is no dispute that Hunter, as a woman, is a member of a protected class under Title

VII.  There is also no dispute that she was qualified for her position.  What is disputed is whether

Hunter, for purposes of her disparate treatment claim, suffered an adverse employment action and

whether she was treated less favorably than others not in her protected class.

The Tenth Circuit liberally defines "adverse employment action."  Sanchez, 164 F.3d at

532.  Ultimately, action is adverse employment action if it constitutes a significant change in

employment status such as, but not limited to, hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits.  Id.

The guiding principal in the Court's case-by-case analysis is that an adverse employment action is

one that alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects her status as an employee.  Heno v. Spring/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2000).

It is clear that being paid less than male employees in similar positions and being given less generous benefits and perquisites than male employees in similar positions are adverse employment actions.  See Sprague, 129 F.3d at 1363.  However, Hunter fails to show that she was paid less than any male in a similar job.  She offers no evidence to support her contention that the male hired to replace her was paid more than she.  In fact, the only evidence in the case with regard to the salary of Ms. Hunter's replacement is that his starting salary was identical to the salary Ms. Hunter was receiving when her employment ended.

With regard to Hunter's allegations that she received less generous benefits, perquisites, and other conditions of employment, her evidence that male staff members went out together without inviting the female staff during a 2001 league convention does not show adverse action. Nothing about the male staff members' choice to socialize with one another without the female staff resulted in a significant change in Hunter's employment status or altered the compensation, terms, conditions, privileges or status of her employment.  The same is true with regard to Hunter's evidence that male staff and players were welcome to join management at strip clubs while females were not.  While Hunter alleges that male staff were treated more generously than female staff with regard to expected working hours, her evidence does not support this contention.  The only evidence Hunter provides is that a male employee, upon hearing that staff were expected to work from 8:30 to 5:30, chuckled and said, "we'll see about that."  This evidence does not support an inference that male staff were not expected to work the same hours

as female staff.  Hunter's allegation with respect to lunch breaks is similarly unsupported.  Her evidence only shows that some of the women felt they were treated unequally with it came to taking a lunch break.

The only evidence tending to show unequal treatment is Hunter's evidence that Defendant Boucher was allowed to take merchandise from the team store and was given free or discounted tickets and the evidence that Defendant Frank took Defendant Dunn and another male employee on a trip to Las Vegas while he never took female staff on similar trips.[7]  While these facts might be considered adverse employment actions, they will not ultimately support Hunter's prima facie case.  Hunter provides no evidence showing she held a job similar to that of Defendant Boucher, Defendant Dunn, or the male staff person who was taken to Las Vegas.  Therefore, Defendants are entitled to summary judgment with regard to Hunter's disparate treatment claims in Counts VI and IX.

B.    Hunter's Hostile Work Environment Sexual Harassment Claims in Counts VIII and XI.

Title VII forbids actions taken on the basis of sex that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment."  Faragher v. Boca Raton, 524 U.S. 775, 786 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)).  Hostile work environment harassment occurs when unwelcome sexual conduct "'unreasonably interfer[es] with an individual's work performance or creat[es] an intimidating, hostile, or offensive working environment.'"  Smith v. Norwest Financial Acceptance, Inc.,129 F.3d 1408, 1412 (10th Cir.

---

[7]Defendant Frank did send Hunter and her husband to an All-Star game.  Hunter distinguishes her trip from the trip taken by Frank, Dunn and another employee.  She states that the trip taken by the men was a perquisite while her trip was a reward from Frank because she did some housesitting and babysitting for him.

1997) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)); 29 C.F.R. S

1604.11(a)(3).  Meritor states that "[f]or sexual harassment to be actionable, it must be

sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an

abusive working environment.'"  477 U.S. at 67 (citation omitted).  There is no "mathematically

precise test" for determining whether conduct is sufficiently severe or pervasive.  Harris v.

Forklift Sys., Inc., 510 U.S. 17, 22 (1993).  Some factors to be weighed include "the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  Id. at 23.

　　　　The Tenth Circuit has stated that, "Our precedents, however, eschew ... a mechanical

approach to analyzing hostile work environment claims."  Penry v. Federal Home Loan Bank of

Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998).  In  Meritor, the Supreme Court stated that the

existence of sexual harassment must be determined "in light of the record as a whole," and the

trier of fact must examine the totality of the circumstances, including "the context in which the

alleged incidents occurred."  477 U.S. at 69 (quoting 29 C.F.R. S 1604.11(b) (1985)) (internal

quotation marks omitted).  Indeed, the very term "environment" indicates that allegedly

discriminatory incidents should not be examined in isolation.  Penry, 155 F.3d at 1261.  Thus, this

Court must examine the totality of the circumstances in reviewing the summary judgment motion

with regard to Hunter's hostile environment claims. See, Davis v. U.S. Postal Svc.,142 F.3d

1334, 1341 (10th Cir. 1998); Smith, 129 F.3d at 1413.

　　　　Defendants' argument for summary judgment on Hunter's hostile environment claims

examines individual statements and actions in piecemeal fashion.  For instance, Defendants argue

14

that some of the alleged harassing incidents cannot support Hunter's claim because they involved statements overheard by Hunter rather than statements made directly to her.   Defendants also urge that some of the incidents cannot support Hunter's claims because she did not complain about them at the time.[8]   Defendants contend that some of the alleged statements cannot support Hunter's claims because they were not sexual *per se*.   According to Defendants, some of the incidents cannot be considered because they occurred outside the work environment.   Finally, after attempting to eliminate many of the incidents with the above arguments, Defendants assert that the remaining incidents were not sufficiently pervasive to support Hunter's claim.

The problem with Defendants' argument is that it ignores the totality of the circumstances and attempts to have the Court focus on the trees rather than the forest.   Even if some of the alleged incidents, such as those occurring outside of the workplace, did not contribute to the overall work environment, there are sufficient disputed facts with regard to the totality of the circumstances to preclude summary judgment on Hunter's hostile work environment claims in Counts eight (VIII) and eleven (XI).   Defendants' motion for summary judgment with regard to these claims will consequently be denied.

III.   PLAINTIFF'S CLAIMS FOR CIVIL CONSPIRACY (COUNT XXV) AND AIDING AND ABETTING (COUNT XIV)

To establish a claim for civil conspiracy, a plaintiff must demonstrate that (1) a conspiracy between two or more individuals existed; (2) specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) plaintiff was damaged as a result.   Ettenson v. Burke, 17 P.3d 440 (N.M. App. 2000).   An actionable civil conspiracy must involve a

---

[8]Hunter disputes this and offers evidence that she did complain.  Whether she complained is a disputed issue of fact.

combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  Las Luminarias of the New Mexico Council of the Blind v. Isengard, 587 P.2d 444, 447 (N.M. App. 1978).  The existence of a civil conspiracy must be pled by direct allegations or by allegations of circumstances from which a conclusion of the existence of a conspiracy may be reasonably inferred.  Id.  The circumstances, considered as a whole, must create a genuine issue of material fact regarding an agreement among the alleged conspirators.  Morris v. Dodge Country, Inc., 513 P.2d 1273, 1274 (Ct. App. 1973).

The New Mexico Human Rights Act makes it an unlawful discriminatory practice for any person or employer to "aid, abet, incite, compel or coerce the doing of any unlawful discriminatory practice or attempt to do so . . .. N.M. Stat. Ann. 28-1-7(I)(1).  No New Mexico cases have interpreted the aiding and abetting aspect of the Human Rights Act.  However, New Mexico courts have addressed actions in tort for aiding and abetting others to commit tortious acts.  See GMC, Inc. v. Kentucky Central Life Ins. Co., 947 P.2d 143 (N.M. 1997).  In GMC, Inc., the New Mexico Supreme Court recognized an action in tort for aiding and abetting a breach of fiduciary duty.  In doing so, the court specifically referenced the Restatement (Second) of Torts § 876(b) and stated that, "New Mexico recognizes tort liability for aiding and abetting another's tortious conduct."  GMC, Inc., 947 P.2d at 147.  The Restatement provides that a person is liable for the tortious conduct of another when he knows that the other's conduct is a breach of duty to a third person and he gives substantial assistance or encouragement to the other's conduct, or if he gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.  Restatement (Second) of Torts § 876(a) and (b).

Defendants argue that Hunter has no evidence of concerted action among any of the Defendants and thus fails to create a genuine issue of material fact with regard to all of the essential elements of either a civil conspiracy or an aiding and abetting claim.  In response, Hunter gives a one line conclusory statement that Defendants did not act alone but "conspired, illegally, in concert, to deprive Plaintiffs of their civil rights."  See Docket No. 141 p. 23.

On summary judgment, the movant may meet its Rule 56 burden by pointing out to the court that the nonmovant "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322-23.  Once a movant has met its burden of pointing out that the nonmovant has failed to show the existence of an element essential to her case, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-7 (1986).  To meet her burden, the nonmovant must "designate specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324. The nonmovant cannot satisfy its burden with conclusory allegations.  Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

Hunter's conclusory statement in response to Defendants' motion for summary judgment on the civil conspiracy and aiding and abetting claims falls short of meeting Hunter's burden of establishing the existence of a genuine issue for trial.  Hunter made no efforts to designate specific facts showing a genuine issue for trial on each of the elements of a civil conspiracy and aiding and abetting claim, and the Court will not comb through the voluminous record in this case searching for evidence to support the claims.  Consequently, Defendants are entitled to summary judgment with regard to these claims.

17

IV.    PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL
        DISTRESS IN COUNT XVII

Defendants make three arguments in support of summary judgment on Hunter's claim for

intentional infliction of emotion distress (IIED).  Defendants first urge that the IIED claim is

actually an element of damages for Hunter's other claims rather than a separate claim.  Then,

assuming that Hunter's other claims fail at the summary judgment stage, Defendants contend that

the IIED damages must also fail.  Second, Defendants argue that, even if the IIED claim is

considered a separate claim rather than just a damages component of other claims, it must fail

because it is barred by the exclusivity provisions of the New Mexico Worker's Compensation Act.

Finally, Defendants contend that Hunter has failed to support the claim because the facts do not

show sufficiently outrageous behavior for an IIED claim.

Defendants' first two arguments are easily rejected.  There is no legal support for the

argument that IIED is a component of damages rather than a distinct legal claim.  While emotional

distress is a component of damages for many claims, New Mexico has unequivocally recognized a

separate claim for the tort of IIED.  See Dominguez v. Stone, 638 P.2d 423, 426 (N.M. App.

1981).  Defendants' contention that an IIED claim is barred by the exclusivity provision of the

Worker's Compensation Act (WCA) is equally without merit.  Injuries cause by sexual

harassment do not arise out of employment and are not covered by the WCA.  See Coates v. Wal-

Mart Stores, Inc., 976 P.2d 999, 1005 (N.M. 1999).  Accordingly, "the exclusivity provision [of

the WCA] does not preclude an employee from seeking a remedy outside the WCA for injuries

caused by sexual harassment."  Id.

In order to establish a claim for IIED, a plaintiff must show that (1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the plaintiff's mental distress. Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 P.3d 333, 342 (N.M. 2001). Extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Id. (citing Restatement (Second) of Torts § 46 cmt. d). As a threshold matter, a trial court must determine whether, as a matter of law, the conduct at issue may reasonably be regarded as sufficiently extreme and outrageous as to permit recovery under the tort of IIED. Id. at 343. If reasonable persons could differ on the question, the issue whether the conduct is sufficiently extreme and outrageous is for the jury. Id.

In Trujillo, an employee, Mr. Trujillo, sued his employer for IIED after his employment was terminated. Mr. Trujillo had worked for the defendant for fifteen years in the billing department. An independent audit had revealed record-keeping problems within the business, and the employer initiated an internal audit to determine the source and extent of billing and record-keeping errors. Mr. Trujillo, along with other employees in the billing department, was sent to a seminar on record-keeping. During the seminar, Mr. Trujillo became ill. He was given a preliminary diagnosis of a serious condition and remained on sick leave for a month. After a month, Mr. Trujillo's doctor cleared him to return to work on a part time basis. When he returned to work, Mr. Trujillo met with his supervisor to discuss concerns about his work that had been discovered in his absence. The supervisor stated that he wanted Mr. Trujillo to work

19

full time and placed Mr. Trujillo on paid administrative leave. A week later, the employer sent Mr. Trujillo a letter informing him that his employment was being terminated based on a lack of confidence in Mr. Trujillo's job performance. The case went to trial, the IIED claim was submitted to the jury, and a verdict was returned in Mr. Trujillo's favor. Trujillo, 41 P.3d at 337. On appeal, the employer argued that there was insufficient evidence to support the verdict. Id. The New Mexico Supreme Court agreed finding that there was no evidence of specific instances in which the employer's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. Id. at 343.

In Coates, two former employees brought IIED claims against Wal-Mart for sexual harassment by a supervisor. The plaintiffs presented evidence that a supervisor, Mr. Alire, had physically and verbally sexually harassed them. Mr. Alire made lewd and vulgar suggestions to the plaintiffs on more than one occasion and made an obscene gesture to one of the plaintiffs on at least one occasion. One incident involved Mr. Alire grabbing one of the plaintiff's breasts from behind while she was operating a forklift. On another occasion, Mr. Alire pulled open the other plaintiff's blouse to look at her breasts. The case went to trial, the IIED claims were submitted to a jury, and a verdict was entered in favor of the plaintiffs. Coates, 976 P.2d at 1002. Wal-Mart appealed the jury verdict arguing that there was insufficient evidence to support the verdict. Id. at 1009. In affirming the verdict, the New Mexico Supreme Court found that Mr. Alire's conduct was outrageous. Id.[9]

---

[9]The New Mexico Supreme Court also held that a reasonable jury could find that Wal-Mart, through its supervisor and management, intentionally allowed the sexual harassment by Mr. Alire with utter indifference to the consequences. Coates, 976 P.2d at 1009. The plaintiffs had complained to management of the harassment on several occasions to no avail. Also, supervisors had witnessed the harassment and had done nothing to intervene. Id.

Assuming the facts in a light most favorable to Hunter, the egregiousness of the Defendants' conduct is more similar to the conduct at issue in Coates than the conduct at issue in Trujillo.  Unlike Hunter, the plaintiff in Trujillo never suffered abusive or foul language, was not yelled at, and was not subjected to offensive gestures or comments.  The plaintiffs in Coates, like Hunter, were subjected to lewd and vulgar suggestions and obscene gestures.  The conduct at issue in Coates is decidedly more extreme and outrageous than anything suffered by Hunter; the plaintiffs in Coates were physically sexually harassed while Hunter offers no evidence she was subjected to any physical contact.  This distinction, however, does not necessarily mandate a conclusion that the conduct of the Defendants was not outrageous.  Nothing in the law suggests that a claim of IIED requires a showing of physical assault or harm.  To the contrary, the courts in New Mexico have rejected any requirement that a plaintiff suffer physical impact in order to recover for severe emotional distress.  See Madrid v. Lincoln County Medical Center, 909 P.2d 14, 19-20 (N.M. App. 1995).

Defendants' argument for summary judgment on Hunter's IIED claim relies in part on a case out of the United States District Court for the District of Kansas applying Kansas state law.  In Mart v. Dr. Pepper Co., 923 F.Supp. 1380 (D. Kan. 1996), the court found that a plaintiff's evidence of sexual harassment did not show sufficiently outrageous conduct to survive summary judgment on her claim under the Kansas tort of outrage.[10]  In that case, the plaintiff was an

---

[10]The elements of the Kansas tort of outrage are that (1) the conduct of the defendant was intentional or in reckless disregard of plaintiff; (2) the conduct was extreme and outrageous; (3) there is a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) plaintiff's mental distress is extreme and severe.  Mart, 923 F.Supp. at 1389.  New Mexico courts have recognized that the tort of IIED is also known as the tort of outrage.  Padwa v. Hadley, 981 P.2d 1234, 1237 (N.M. App. 1999).

account sales manager for Dr. Pepper.  She had regular ongoing business contacts with Mr.

Terrell, a manager for a bottling facility owned by Pepsi.  According to the plaintiff, Mr. Terrell

made several inappropriate comments with sexual connotations such as referring to his secretary

as a "bitch," stating that he would like to give plaintiff a "big, sloppy, wet kiss," referring to

another female as a "cunt," and stating that his secretary wore "fuck me pumps."   He also used

vulgar language and talked about problems with his teenage daughter stating that he wished girls

were more like men.  On one occasion, Mr. Terrell yelled at plaintiff saying, "You're not going to

fuck me and fuck me, get on top of me, get me pregnant and leave me."   The district judge

granted the defendants' motion for summary judgment on plaintiff's claim under the Kansas tort

of outrage.  Id. at 1389.  The Court noted a reluctance under Kansas law to permit a claim for

outrage relating to sexual harassment in the employment setting.  Id.  The Court then found that

Mr. Terrell's conduct, while offensive, was not extreme and beyond the bounds of decency.  Id.

        The facts of this case resemble those in Mart, but Mart is readily distinguishable on several

points, and Mart does not persuasively inform the Court on Hunter's IIED claim.  Factually, the

frequency and pervasiveness of the alleged conduct in this case is greater than that at issue in

Mart.  For instance, the plaintiff in Mart alleged conduct by a single person, Mr. Terrell, while

Hunter alleges conduct by at least two persons including Defendant Dunn and Defendant

Boucher.  The plaintiff in Mart alleged approximately seven specific instances of inappropriate

conduct while Hunter provides evidence of multiple specific instances of inappropriate conduct as

well as evidence of more generally pervasive conduct such as being called a "bitch" or some

related term on forty to fifty occasions, the use on many occasions by Defendants of terms such as

"slits" and "peelers," and a tendency on the part of some Defendants to tell stories of a sexual or offensive nature.

In addition to these factual distinctions, there is an important difference in the law applied in Mart and the New Mexico tort of IIED.  The Kansas tort of outrage does not normally lie in cases alleging sexual harassment in an employment context.  Mart, 923 F.Supp. at 1389.  In contrast, the New Mexico tort of IIED has been held to be a proper claim in cases of sexual harassment in an employment context.  See Coates, 976 P.2d at 1009-10.   Finally, New Mexico is not Kansas, and the Court cannot conclude that a New Mexico court would agree with a Kansas court on the type of conduct that is beyond all possible bounds of decency.  Accordingly, the Court does not find Mart persuasive on the issue of Hunter's IIED claim, and analyzes her claim solely in light of Coates and Trujillo.

Given that all reasonable factual inferences must be drawn in favor of Hunter, the Court cannot conclude, as a matter of law, that the conduct at issue in this case may not be reasonably regarded as sufficiently extreme and outrageous as to permit recovery under the tort of IIED. The issue whether the conduct in this case is sufficiently extreme and outrageous is for the jury. Accordingly, Defendants are not entitled to summary judgment on Hunter's claim of IIED and Defendants' motion with regard to this claim is denied.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment as to All Claims by Kaye Hunter [Docket No. 123] is hereby GRANTED IN PART as follows:

1.      Judgment is GRANTED in favor of Defendants on Plaintiff Hunter's claims for
retaliation under Title VII and the New Mexico Human Rights Act in Counts
twelve (XII) and thirteen (XIII).

2.      Judgment is GRANTED in favor of Defendants on Plaintiff Hunter's claim under
the Equal Pay Act in Count eighteen (XVIII).

3.      Judgment is GRANTED in favor of Defendants on Plaintiff Hunter's contract
claims in Counts nineteen (XIX), twenty (XX) and twenty-one (XXI).

4.      Judgment is GRANTED in favor of Defendants on Plaintiff Hunter's retaliatory
discharge claim in twenty-two (XXII).

5.      Judgment is GRANTED in favor of Defendants on Plaintiff Hunter's claims for
false light and defamation in Counts twenty-three (XXIII) and twenty-four
(XXIV).

6.      Judgment is GRANTED in favor of Defendants on Plaintiff Hunter's claim for
interference with a business advantage in Count twenty-six (XXVI).

7.      Judgment is GRANTED in favor of Defendants on Plaintiff Hunter's claims under
Title VII and the New Mexico Human Rights Act for sexual harassment in Counts
seven (VII) and ten (X).

8.      Judgment is GRANTED in favor of Defendants on Plaintiff Hunter's claims under
Title VII and the New Mexico Human Rights Act for disparate treatment in
Counts six (VI) and nine (IX).

9.      Judgment is GRANTED in favor of Defendants on Plaintiff Hunter's claim for
Civil Conspiracy in Count twenty-five (XXV).

10.     Judgment is GRANTED in favor of Defendants on Plaintiff Hunter's claim for

Aiding and Abetting under the New Mexico Human Rights Act in Count fourteen

(XIV).

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment as to All

Claims by Kaye Hunter [Docket No. 123] is hereby DENIED IN PART as follows:

11.     Defendants' motion is DENIED with regard to Plaintiff Hunter's Title VII and

New Mexico Human Rights Act claims for Hostile Work Environment sexual

harassment in Counts eight (VIII) and eleven (XI).

12.     Defendants' motion is DENIED with regard to Plaintiff Hunter's claim for

Intentional Infliction of Emotion Distress in Count seventeen (XVII).

_____

UNITED STATES DISTRICT JUDGE