IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO
_____

ROSANN WILLIAMS, et al.,

      Plaintiffs,

v.                                      Civil No. 03-1195 WJ/ACT

W.D. SPORTS N.M., INC., et al.,

      Defendants.

**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AS TO ALL CLAIMS BY PLAINTIFF DALY**

      THIS MATTER comes before the Court pursuant to Defendants' Motion for Summary Judgment as to All Claims by Moira Daly [Docket No. 127].

**BACKGROUND**

      The following is a summary of undisputed facts, facts deemed admitted or facts considered in the light most favorable to plaintiff.

      Before delving into the facts specifically relevant to this Motion for Summary Judgment, the Court will give a brief overview of the case for the purpose of introducing the relevant parties. Defendant W.D. Sports N.M., Inc. d/b/a The New Mexico Scorpions (W.D. Sports) is a professional hockey team that plays in Albuquerque, New Mexico.  At all times relevant to this case, Defendant William Douglas Frank was the president of W.D. Sports.  Defendant Patrick J. Dunn was the General Manager (GM) of the hockey team in the Spring of 2001 and became head coach in April 2002.[1]  Dan Burgers replaced Dunn as GM in April 2002 when Dunn became head coach.  Defendant Tyler Boucher was assigned in July 2001 to assist in sales.  He eventually

_____

[1]At some time subsequent to the events in this case, Mr. Dunn transferred to Texas.

became Assistant to the President.  Defendant Bruce Levine was hired as comptroller, CPA and lawyer after all but one plaintiff, Plaintiff Marquart, had left the organization.

Plaintiff Moira Daly began working for W.D. Sports in May 2001 as the Controller.  She was hired at an annual salary of $32,500.  When she left her employment in June 2002, she was being paid an annual salary of $35,000.  Defendant Levine was hired to perform Daly's duties and was paid a starting annual salary of $35,000.

Ms. Daly was sent a letter by Defendant Dunn dated May 25, 2001 that outlined the terms of Daly's employment.  The letter included Daly's duties and compensation including salary, benefits and perquisites.  Daly believed the letter was an employment contract but understood that the letter did not mean she could not be fired or that she could not quit before the season ended.

During Daly's interview for employment with W.D. Sports, she overheard the interviewer comment that a previous candidate was "hot."  At some time during Daly's employment, Defendant Frank and two male managers including Defendant Dunn took a trip to Las Vegas, Nevada.  Daly characterizes this trip as a perquisite, and states that there was a "gender line" between who received the perquisite and who did not.  Additionally, Daly states that sexually charged stories about the trip were overheard by another woman in the office and that this contributed to the hostile work environment.

Ms. Daly hosted a party at her home in the summer of 2001 when the 2001-2002 staff had been assembled.  At the party, Defendant Boucher suggested that if he wasn't engaged to someone else, he would be with Ms. Daly.  At this same party, Defendant Dunn boasted in Ms. Daly's presence that one of the applicants for a job with W.D. Sports had posed for Playboy magazine.  He then sent someone out to buy the magazine.

2

During her employment with W.D. Sports, Daly heard Defendants Dunn and Boucher refer to women as cougars. She came to learn that this term referred to older women whom the men found attractive in spite of their age. Defendant Boucher complained to her once in the office that he "wasn't getting any" because his wife had stomach problems. Ms. Daly heard Dunn refer to himself as "The Dominator" because he "got so many shutouts, and my wife won't give it up."[2]

Ms. Daly complained to Defendants Dunn and Frank about being mistreated by a vendor who called her a "fucking bitch." She contends that nothing was done in response to her complaints.

Ms. Daly heard rumors from the men about who was dating whom and who was "doing it" with whom. Ms. Daly did not believe these rumors were appropriate in a workplace. Ms. Daly was particularly put off by gossip about Plaintiff Williams. Daly confronted the Scorpions' equipment manager for calling Plaintiff Williams a "fucking bitch." The equipment manager retorted that Ms. Daly was not his "fucking boss." Ms. Daly reported this to Defendant Dunn. The equipment manager yelled at Daly on a couple of other occasions as well.

On one occasion, Ms. Daly was leaving work to go on a date. Defendant Dunn told her, "Don't bang them on the first night." Defendant Frank encouraged Daly to date a corporate sponsor and told Ms. Daly the sponsor had a lot of money. Ms. Daly demurred, and Mr. Frank urged her to "just do it for the team." Ms. Daly heard from a male staff that the men had placed

---

[2]One of the hockey players had earned the nickname "The Dominator" by having a lot of shut-out games.

bets on who would get Ms. Daly first.  Whenever John Phillips, attorney for the Scorpions, came into the office, Defendants would tease Ms. Daly by referring to Phillips as her boyfriend.

Defendant Boucher complained to Daly that his sister was marrying a "fucking chink."  He told Daly that the receptionist was a "retard."  Boucher told Daly that Plaintiff Williams was a "fucking liar."  Ms. Daly was present at a staff meeting when Boucher heaped vulgarities on Plaintiff Williams.  According to Daly, nothing was done about this.

Defendant Frank threatened  the staff during a staff meeting that they were to keep silent about the sexual escapades of team members during road trips.  After Ms. Williams left her employment with W.D. Sports, attorney Phillips referred to Ms. Williams as a "bitch" when telling Ms. Daly that Williams had filed an unemployment insurance claim.

Defendant Burgers commented on Daly's cigarette smoke and remarked that taking Vitamin E would be good for her sex drive.  Daly observed Burgers take accounts from a female employee.  When Daly protested that the accounts belonged to the female employee, Burgers stated, "not anymore."  Burgers told Daly that Plaintiffs Hunter and Marquart were stupid. Another male employee referred to Ms. Marquart as a "bitch" in front of Ms. Daly and referred to Ms. Daly as the "queen bitch" in front of Ms. Marquart.

Ms. Daly heard from multiple people in the office that Defendant Dunn had told a story about defecating on a golf course.  She also heard from co-workers that Dunn told a story about pole-dancing in a hot tub and visiting a nude bar.

Other women came to Ms. Daly for help.  Ms. Daly complained to Defendant Dunn on behalf of some of the other female employees who had come to her upset about being harassed about their personal lives. However, she stopped passing complaints from the other female

4

employees to Dunn because she believed that nothing was done in response to complaints based on the fact that the complained of behavior continued to occur.

Ms. Daly heard from several other staff members that Defendant Frank had said he was going to get rid of all the "fucking bitches" at the end of the season.  In June of 2002, Burgers told Daly that W.D. Sports needed to replace her with a CPA, but that she could stay and sell for the team because she was pretty.  Burgers told her she could do corporate sales, remarking suggestively that "If we can't close a corporate deal, we'll send you in to close it."  Daly, who was then making a $35,000 a year salary, was offered $30,000 to stay and do sales.  Daly declined this position.  When she did so, Defendant Frank stated, "What do you want?  Do you want to be queen of the office?  Be queen of the office, because I got rid of everybody else in the office.  The only one that's remaining . . .", and pointed to the office of a female employee.  Daly  was then offered a position as assistant to the President.  Daly declined this offer and left employment with W.D. Sports.  Defendant Levine had apparently been hired to fill Daly's position before Daly was notified that a CPA was needed for the position.  Levine is not a CPA.

No one at W.D. Sports ever made actual sexual advances toward Ms. Daly, and no part of her job was ever conditioned on performing sexual acts.  However, Ms. Daly contends that she was pressured to date a patron of the Scorpions hockey team.  Additionally Daly states that the Defendants bet on who would get her first, refused to protect her from a vendor who was harassing her, and made comments about whether she should "bang" her dates.

Daly and several other Plaintiffs filed a Complaint against Defendants that included twenty-six counts.  Daly's claims included claims for gender discrimination disparate treatment under Title VII and the New Mexico Human Rights Act (NMHRA); claims for gender

discrimination sexual harassment under Title VII and the NMHRA; claims for gender

discrimination hostile work environment under Title VII and the NMHRA; claims for retaliation

under Title VII and the NMHRA;  a claim for aiding and abetting under the NMHRA; a claim of

intentional infliction of emotional distress; claims for breach of contract, breach of implied

contract, and breach of the covenant of good faith and fair dealing; a claim for retaliatory

discharge; and claims for false light, defamation, civil conspiracy, and interference with a business

advantage.

      Defendants filed the instant Motion for Summary Judgment arguing that Daly's disparate

treatment claims must fail because there is insufficient evidence that male staff doing equal work

were paid more than Ms. Daly or had more generous conditions of employment.  Defendants urge

they are entitled to summary judgment with regard to Daly's sexual harassment claims because

there is no evidence of quid pro quo sexual harassment, and Daly cannot come forth with

sufficient evidence to establish her hostile work environment claims.  Defendants ask for summary

judgment with regard to Daly's retaliation claims because she cannot show a causal connection

between any protected activity and any adverse action.  Defendants contend they are entitled to

summary judgment with regard to Daly's contract claims because there is no evidence of any

employment contract between Defendants and Daly.  With regard to Daly's retaliatory discharge

claim, Defendants urge that Daly cannot show that she was discharged or that she was discharged

for an activity or refusal protected by New Mexico public policy.  Defendants assert that Daly's

claim for interference with a business advantage must fail because Daly has no evidence of a

prospective business advantage and because she has no evidence of anything done by Defendants

to interfere with any prospective business advantage.  Defendants argue they are entitled to

summary judgment with regard to Daly's claims for defamation and false light because any statements made were opinions, and any statements that were statements of fact were true. Additionally, Defendants argue that Daly cannot show damage to her reputation. With regard to Daly's claims for civil conspiracy and aiding and abetting, Defendants contend that Daly cannot show any concerted action, common design or agreement. Defendants assert that Daly's claim for intentional infliction of emotional distress must fail because it is a component of damages rather than an independent claim, and she cannot show sufficiently extreme or outrageous behavior on the part of the Defendants to support the claim.

**LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing an absence of a genuine issue of material fact falls upon the moving party. See Adler v Wal-Mart Store, Inc., 144 F.3d 664, 670 (10th Cir. 1998). However, when the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by pointing out to the Court that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v Catrett, 477 U.S. 317, 322-23 (1986); Adler, 144 F.3d at 671. The nonmoving party must then go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial sufficient to support a verdict for the nonmovant. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). The nonmovant cannot satisfy its burden with conclusory allegations. Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990). All reasonable factual inferences must be drawn

in favor of the nonmoving party.  Seamons v Snow, 206 F.3d 1021, 1026 (10th Cir. 2000); Curtis

v Oklahoma City Public Sch. Bd. of Ed., 147 F.3d 1200, 1214 (10th Cir. 1998).

**DISCUSSION**

I.    PLAINTIFF DALY'S CONTRACT CLAIMS, RETALIATORY DISCHARGE CLAIM,
      CLAIM FOR INTERFERENCE WITH BUSINESS ADVANTAGE, FALSE LIGHT
      AND DEFAMATION CLAIMS AND RETALIATION CLAIMS

      In Daly's Response, she consents to the dismissal of her claim for interference with a

business advantage in Count twenty-six (XXVI), her claim for retaliatory discharge in Count

twenty-two (XXII), her contract claims in Counts nineteen (XIX), twenty (XX), and twenty-one

(XXI), her false light and defamation claims in Counts twenty-three (XXIII) and twenty-four

(XXIV) and her retaliation claims in Counts twelve (XII) and thirteen (XIII).  This Court already

dismissed Daly's retaliation claims in its Memorandum Opinion and Order filed March 5, 2004

[Docket No. 49].  Accordingly, Defendants are entitled to judgment with regard to Daly's claims

for interference with a business advantage, retaliatory discharge, her contract claims and her

claims for false light and defamation.

II.   PLAINTIFF DALY'S GENDER DISCRIMINATION CLAIMS

      Daly's Title VII claims include Count six (VI) for gender disparate treatment, Count seven

(VII) for gender sexual harassment, and Count eight (VIII) for gender hostile work environment.

Daly's New Mexico Human Rights Act (NMHRA) claims for gender discrimination include

Count nine (IX) for gender disparate treatment, Count ten (X) for gender sexual harassment, and

Count eleven (XI) for gender hostile environment.

      As an initial matter, the Court must determine whether anything differentiates these claims

from one another in light of Daly's allegations.  See, Meritor Sav. Bank v. Vinson, 477 U.S. 57,

65 (1986) (Hostile environment sexual harassment is actionable under Title VII's prohibition against sex discrimination).  Courts have interpreted Title VII to prohibit two types of sexual harassment:  quid pro quo sexual harassment and hostile work environment sexual harassment. Hirschfeld v. N.M. Corrections Dep't, 916 F.2d 572, 757 (10th Cir. 1990).  Quid pro quo sexual harassment involves a conditioning of tangible employment benefits upon the submission to sexual conduct.  Hicks v Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir. 1987).  Hostile work environment harassment occurs "where [sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating hostile or offensive working environment."  Meritor Sav. Bank, 477 U.S. at 65.

Daly alleges hostile work environment as a separate claim for sexual harassment.  From the facts alleged, supported and argued with respect to the Motion for Summary Judgment, there is no doubt that Daly intends a claim for hostile work environment sexual harassment.  In her response to the motion for summary judgment, Daly argues that her claim of sexual harassment is distinct from her claim of hostile work environment because the Defendants (1) bet on who would get her first, (2) refused to protect her from a vendor who was harassing her, (3) made comments about whether she should "bang" her dates, and (4) pressured her to date a patron.  The first three enumerated reasons given by Daly for differentiating her hostile environment claim from her sexual harassment claim are not evidence of quid pro quo sexual harassment - they are properly characterized as evidence toward a hostile environment claim.  The fourth reason, however, could be properly characterized as quid pro quo sexual harassment if some tangible employment action resulted from Daly's refusal to date a patron.  Accordingly, Daly's separate claims for sexual

harassment in Counts VII and X will be analyzed as quid pro quo sexual harassment claims based solely on her allegation that she was pressured to date a patron.

There are two types of employment discrimination.  There is disparate treatment discrimination which occurs when an employer treats an employee less favorably than others on the basis of that employee's race, gender or some other protected characteristic.  <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 609 (1993).  There is also disparate impact discrimination which occurs when a facially neutral employment practice has a greater negative impact on a protected class of employees and the practice is not justified by a business necessity.  <u>Id.</u>  Clearly, Daly's claims of hostile environment sexual harassment are brought under the disparate treatment theory of employment discrimination.  Thus, to the extent Daly's employment discrimination claims are based on a hostile work environment, Hunter's disparate treatment claims in Counts VI and IX are superfluous in light of her hostile environment claims in Counts VIII and XI.  In Daly's response to the motion for summary judgment, she suggests that, in addition to the hostile environment, she was treated differently than male employees because she was paid less and because men received more generous conditions of employment including special perquisites and a more flexible code of conduct.  Additionally, Daly argues that she was involuntarily removed from her position as Controller.  Thus, Daly's disparate treatment claims in Counts VI and IX will be analyzed on the basis of the alleged unequal pay, unequal benefits and terms of employment as well as on the basis of the involuntary removal from her position as Controller.

    A.    <u>Daly's Claim of Quid Pro Quo Sexual Harassment in Counts VII and X.</u>

The Supreme Court has noted that the terms "quid pro quo" sexual harassment and "hostile work environment" sexual harassment are not present in the statutory language of Title

VII.  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752 (1998).    The term "quid pro quo" is useful to distinguish cases in which a supervisor demands sexual favors in exchange for a job benefit and carries out the threat from cases in which a threat is not carried out.  Id. at 753.  When a plaintiff proves that a tangible employment action is the result of a refusal to submit to sexual demands, she has established an action under Title VII.  Id. at 753-54.  However, where a claim involves only unfulfilled threats, it is properly characterized as a hostile work environment claim. Id. at 754.

Here, Daly has provided some evidence suggesting that Defendant Frank made a sexual demand on her.[3]  Daly also provides evidence that she was removed from her employment position and offered alternative positions that paid less money.  Whether this action is characterized as a demotion or an undesirable reassignment, it is a tangible employment action. Id. at 765. Defendants' motion does not raise the issue of whether Daly can show an express or implied threat that failure to submit to the alleged sexual demand would result in a tangible employment action.  Nor does Defendants' motion raise the issue whether Daly can show a nexus between her refusal to submit to an alleged sexual demand and the tangible employment action. Not surprisingly, Plaintiff's response does not address these issues either.  Accordingly, the Court will not, at this time, take up these issues.  Defendants are not entitled to summary judgment on Plaintiff's sexual harassment claims in Counts VII and X.

B.    Daly's Disparate Treatment Claims in Counts VI and IX.

_____

[3]Defendants point to Daly's deposition testimony that none of the Defendants ever specifically asked her to perform a sexual act as evidence defeating any quid pro quo sexual harassment claim.  However, a quid pro quo may be based on sexual demands other than demands that a person perform a sexual act.  See e.g., Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49 (1st Cir. 2000).

The three-stage <u>McDonnell Douglas</u> burden shifting analysis applies to claims of discrimination under Title VII when no direct evidence of discrimination exists.  <u>See</u> <u>Bullington v. United Air Lines, Inc.</u>, 186 F.3d 1301, 1315-16 (10th Cir. 1999) <u>overruled on other grounds by</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002).  At the first stage, the plaintiff must prove a prima facie case of discrimination.  <u>Perry v. Woodward</u>, 199 F.3d 1126, 1135 (10th Cir. 1999).  Plaintiff establishes a prima facie case by showing that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class.  <u>Sanchez v. Denver Pub. Sch.</u>, 164 F.3d 527, 531 (10th Cir.1998) (citations omitted).  With regard to Title VII equal pay claims, a plaintiff makes a prima facie case of discrimination by showing that she occupies a job similar to that of higher paid males.  <u>Sprague v. Thorn Americas, Inc.</u>, 129 F.3d 1355, 1363 (10th Cir. 1997).  If the plaintiff satisfies her burden and makes a prima facie showing, the burden shifts to the defendant to produce a facially legitimate, non-discriminatory reason for its actions.  <u>Id.</u>  If the defendant articulates a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to show that the defendant's proffered reason for the action is a pretext for discrimination.  <u>Id.</u>

Neither the Defendants nor Daly actually proceeded with the <u>McDonnell Douglas</u> analysis of Daly's potential disparate treatment claims.  Defendants argument at the summary judgment stage addresses only a potential disparate treatment claim on the basis of unequal pay and benefits and urges that there is insufficient evidence to show any disparity in pay or benefits between Ms. Daly and the male employees.  Daly's response notes that Daly's evidence also supports a disparate treatment claim on the basis of her removal from the Controller position.  Thus, the

parties' briefs are focused solely on the second prong - whether Daly suffered an adverse employment action.  The Court will, likewise, focus solely on this prong.

The Tenth Circuit liberally defines "adverse employment action."  <u>Sanchez</u>, 164 F.3d at 532.  Ultimately, action is adverse employment action if it constitutes a significant change in employment status such as, but not limited to, hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  <u>Id</u>. The guiding principal in the Court's case-by-case analysis is that an adverse employment action is one that alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects her status as an employee.  <u>Heno v. Spring/United Mgmt. Co.</u>, 208 F.3d 847, 857 (10th Cir. 2000).

Ms. Daly provides evidence that she was removed from her position as Controller.  This qualifies as an adverse employment action because it constituted a significant change in Daly's employment status.[4]  Ms. Daly also argues that she suffered adverse employment action because the men were paid more, had more generous conditions of employment, received special perquisites, and were allowed to exercise a more flexible code of conduct.

It is clear that being paid less than male employees in similar positions and being given less generous benefits and perquisites than male employees in similar positions are adverse employment actions.  <u>See</u> <u>Sprague</u>, 129 F.3d at 1363.  However, Daly fails to show that she was paid less than any male in a similar job.  She offers no evidence to support her contention that the male hired to replace her as Controller was paid more than she.  In fact, the only evidence in the

---

[4]The parties did not brief, and the Court does not address, whether Ms. Daly's removal from the position of Controller with subsequent offers of lower paying positions was a demotion, reassignment, or constructive discharge.

13

case with regard to the salary of Ms. Daly's replacement is that his starting salary was identical to the salary she was receiving as Controller.  With regard to Daly's allegations that she received less generous benefits, perquisites, and other conditions of employment, her evidence fails to show anything other than a trip to Las Vegas by Defendant Frank.  Nothing about this trip resulted in a significant change in Daly's employment status or altered the compensation, terms, conditions, privileges or status of her employment.  Daly's evidence does not support an inference that she received unequal treatment with regard to pay, perquisites or any other benefits of employment.

Because the parties did not further analyze Daly's potential disparate treatment claims, the Court's role at this stage of the litigation is merely to determine whether Daly has suffered any adverse actions to support a disparate treatment claim aside from her claims for hostile environment sexual harassment.  In accordance with the above analysis, Defendants are not entitled to summary judgment with regard to the disparate treatment claims in Counts VI and IX. However, Daly's disparate treatment claims are limited to claims that her removal from her position as Controller was gender discrimination.

C.    Daly's Hostile Environment Claims in Counts VIII and XI.

Title VII forbids actions taken on the basis of sex that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment."  Faragher v. Boca Raton, 524 U.S. 775, 786 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)).  Hostile work environment harassment occurs when unwelcome sexual conduct "'unreasonably interfer[es] with an individual's work performance or creat[es] an intimidating, hostile, or offensive working environment.'"  Smith v. Norwest Financial Acceptance, Inc.,129 F.3d 1408, 1412 (10th Cir. 1997) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)); 29 C.F.R. S

1604.11(a)(3).  <u>Meritor</u> states that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"  477 U.S. at 67 (citation omitted).  The harassing conduct must be "both objectively and subjectively abusive."  <u>Turnbull v. Topeka State Hospital</u>, 255 F.3d 1238, 1243 (10th Cir. 2001). There is no "mathematically precise test" for determining whether conduct is sufficiently severe or pervasive.  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 22 (1993).  Some factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  <u>Id.</u> at 23.

The actions of which Ms. Daly complain include:

1).   hearing the word "stupid" used once in reference to two other people;
2).   hearing the term "fucking liar" used once in reference to another person;
3).   hearing the word "retard" used once in reference to another person;
4).   hearing the word "chink" used once in reference to another person;
5).   hearing the word "bitch" used once in reference to another person;
6).   hearing the word "hot" used once in reference to another person;
7).   hearing the word "cougar" used several times in reference to other people;
8).   hearing rumors about who was dating who;
9).   hearing complaints from others about sexually charged stories and comments;
10).  hearing complaints from others about sexual harassment;
11).  hearing male staff talk about a job applicant as having been in Playboy magazine, and observing that someone went to buy the magazine.
12).  observing a male staff person heap vulgarities on another woman at a staff meeting.
13).  receiving comments from a fellow employee about her cigarette smoke;
14).  being told by the equipment manager that she wasn't his "fucking boss;"
15).  being yelled at on a couple of occasions by the equipment manager;
16).  being called a "fucking bitch" by a vendor and perceiving that nothing was done about her complaint.
17).  receiving complaints from two male staff that they were not "getting any" from their wives;
18).  being told by a male staff person that he would like to have been with her if he weren't with someone else;

15

19).     hearing that male staff were betting on who would get her first;

20).     being told that taking Vitamin E would be good for her sex drive.

21).     being teased by statements that the team attorney was her boyfriend.

In  Meritor, the Supreme Court stated that the existence of sexual harassment must be determined "in light of the record as a whole."  477 U.S. at 69 (quoting 29 C.F.R. S 1604.11(b) (1985)) (internal quotation marks omitted).  Thus, this Court must examine the totality of the circumstances in reviewing the summary judgment motion with regard to Daly's hostile environment claims. See, Davis v. U.S. Postal Svc., 142 F.3d 1334, 1341 (10th Cir. 1998); Smith, 129 F.3d at 1413.  However, the conduct considered by the Court must still be discriminatory conduct in that it is unwelcome sexual conduct.  The first four incidents enumerated above regarding use of the words "stupid," "fucking liar," "chink," and "retard" are not even remotely sexual in nature and are entirely gender neutral.  This is equally true of the thirteenth through fifteenth enumerated incidents regarding complaints about cigarette smoke and being yelled at by the equipment manager.  Therefore, the Court will not consider these incidents in determining whether the totality of the circumstances show sufficiently severe and pervasive conduct to create an intimidating, hostile, or offensive working environment.

Evidence of harassment of other women may be considered in evaluating a claim of hostile work environment to the extent the harassment of other women creates a generally hostile work atmosphere for the plaintiff.  Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 781-82 (10th Cir. 1995).  Ms. Daly's observation and exposure to the harassment of other women might create or enhance a hostile working environment.  Thus, hearing other women referred to as "bitch," "hot,"  and "cougar," hearing male staff talk about a female applicant appearing in Playboy Magazine, and observing a male staff person heap vulgarities on another female employee

16

are the types of conduct that are considered in evaluating a plaintiff's hostile environment claim. However, hearing others complain about harassment is too remote from the actual harassing conduct to negatively alter a person's work environment.

There is often a cross-over between the professional and personal lives of staff in any workplace. A workplace devoid of any gossip or rumor regarding the personal lives of employees would be remarkable.

In addition to Ms. Daly's exposure to other women being called names and the incident in which she observed another woman being verbally tormented with vulgarities, Ms. Daly's evidence show that potentially sexually offensive conduct was directed toward her on several occasions. Ms. Daly was called a "fucking bitch" by a vendor, and nothing was done when she complained of this to Defendants Dunn and Frank. Defendants Dunn and Boucher each complained to Daly that they were not "getting any" from their wives. Defendant Boucher suggested to Daly that he would be with her if he were not engaged to someone else. Daly heard that male staff were betting on who would get her first. Defendant Burgers told Daly that taking Vitamin E would improve her sex drive. Finally, Daly was teased by Defendants who would make statements that the team attorney was her boyfriend.

All of this conduct, even considering the totality of the circumstances, was not sufficiently severe and pervasive to unreasonably interfere with Ms. Daly's work performance or create an intimidating, hostile, or offensive working environment. There is no evidence to support an inference that the conduct was frequent. None of the conduct was severe. None of the conduct was physically threatening. Some of the conduct might be seen as mildly humiliating, but most involved mere offensive utterances. The behavior was no doubt boorish, immature, and

17

unprofessional.  However, no reasonable jury could find that this conduct altered the conditions of Ms. Daly's employment.  Accordingly, Defendants are entitled to summary judgment with regard to Ms. Daly's hostile environment sexual harassment claims in Counts VIII and XI.

III.   DALY'S CLAIMS FOR AIDING AND ABETTING AND CIVIL CONSPIRACY IN COUNTS XIV AND XXV

To establish a claim for civil conspiracy, a plaintiff must demonstrate that (1) a conspiracy between two or more individuals existed; (2) specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) plaintiff was damaged as a result.  Ettenson v. Burke, 17 P.3d 440 (N.M. App. 2000).  An actionable civil conspiracy must involve a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  Las Luminarias of the New Mexico Council of the Blind v. Isengard, 587 P.2d 444, 447 (N.M. App. 1978).  The existence of a civil conspiracy must be pled by direct allegations or by allegations of circumstances from which a conclusion of the existence of a conspiracy may be reasonably inferred.  Id.  The circumstances, considered as a whole, must create a genuine issue of material fact regarding an agreement among the alleged conspirators.  Morris v. Dodge Country, Inc., 513 P.2d 1273, 1274 (Ct. App. 1973).

The New Mexico Human Rights Act makes it an unlawful discriminatory practice for any person or employer to "aid, abet, incite, compel or coerce the doing of any unlawful discriminatory practice or attempt to do so . . .. N.M. Stat. Ann. 28-1-7(I)(1).  No New Mexico cases have interpreted the aiding and abetting aspect of the Human Rights Act.  However, New Mexico courts have addressed actions in tort for aiding and abetting others to commit tortious acts.  See GMC, Inc. v. Kentucky Central Life Ins. Co., 947 P.2d 143 (N.M. 1997).  In GMC,

18

<u>Inc.</u>, the New Mexico Supreme Court recognized an action in tort for aiding and abetting a breach of fiduciary duty.  In doing so, the court specifically referenced the Restatement (Second) of Torts § 876(b) and stated that, "New Mexico recognizes tort liability for aiding and abetting another's tortious conduct."  <u>GMC, Inc.</u>, 947 P.2d at 147.  The Restatement provides that a person is liable for the tortious conduct of another when he knows that the other's conduct is a breach of duty to a third person and he gives substantial assistance or encouragement to the other's conduct, or if he gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.  Restatement (Second) of Torts § 876(a) and (b).

Defendants argue that Daly has no evidence of concerted action among any of the Defendants and thus fails to create a genuine issue of material fact with regard to all of the essential elements of either a civil conspiracy or an aiding and abetting claim.  In response, Daly gives a conclusory statement that, "[N]or was this abuse carried out by a single person alone.  It was a concerted effort, constituting a conspiracy to deprive the Plaintiff of their rights under the law."  <u>See</u> Docket No. 138 p. 21.

On summary judgment, the movant may meet its Rule 56 burden by pointing out to the court that the nonmovant "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex</u>, 477 U.S. at 322-23.  Once a movant has met its burden of pointing out that the nonmovant has failed to show the existence of an element essential to her case, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial.  <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-7 (1986).  To meet her burden, the

19

nonmovant must "designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. The nonmovant cannot satisfy its burden with conclusory allegations. Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

Daly's conclusory statement in response to Defendants' motion for summary judgment on the civil conspiracy and aiding and abetting claims falls short of meeting her burden of establishing the existence of a genuine issue for trial.  Daly made no efforts to designate specific facts showing a genuine issue for trial on each of the elements of a civil conspiracy and aiding and abetting claim, and the Court will not comb through the voluminous record in this case searching for evidence to support the claims.  See Sandoval v. Boulder Reg'l Communications Ctr.,  -- F.3d --, No. 02-1226, 2004 WL 2445575 (10th Cir. Nov. 2, 2004) (a court is not obligated to comb through the summary judgment record and make a party's case for her). Consequently, Defendants are entitled to summary judgment with regard to Daly's Aiding and Abetting claim in Count XIV and her Civil Conspiracy claim in Count XXV.

IV    DALY'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN COUNT XVII

Defendants make three arguments in support of summary judgment on Daly's claim for intentional infliction of emotion distress (IIED).  Defendants first urge that the IIED claim is actually an element of damages for Daly's other claims rather than a separate claim.  Then, assuming that Daly's other claims fail at the summary judgment stage, Defendants contend that the IIED damages must also fail.  Second, Defendants argue that, even if the IIED claim is considered a separate claim rather than just a damages component of other claims, it must fail because it is barred by the exclusivity provisions of the New Mexico Worker's Compensation Act.

Finally, Defendants contend that Daly has failed to support the claim because the facts do not show sufficiently outrageous behavior for an IIED claim.

Defendants' first two arguments are easily rejected.  There is no legal support for the argument that IIED is a component of damages rather than a distinct legal claim.  While emotional distress is a component of damages for many claims, New Mexico has unequivocally recognized a separate claim for the tort of IIED.  See Dominguez v. Stone, 638 P.2d 423, 426 (N.M. App. 1981).  Defendants' contention that an IIED claim is barred by the exclusivity provision of the Worker's Compensation Act (WCA) is equally without merit.  Injuries cause by sexual harassment do not arise out of employment and are not covered by the WCA.  See Coates v. Wal-Mart Stores, Inc., 976 P.2d 999, 1005 (N.M. 1999).  Accordingly, "the exclusivity provision [of the WCA] does not preclude an employee from seeking a remedy outside the WCA for injuries caused by sexual harassment."  Id.

In order to establish a claim for IIED, a plaintiff must show that (1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the plaintiff's mental distress.  Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 P.3d 333, 342 (N.M. 2001).  Extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Id. (citing Restatement (Second) of Torts § 46 cmt. d).  As a threshold matter, a trial court must determine whether, as a matter of law, the conduct at issue may reasonably be regarded as sufficiently extreme and outrageous as to permit recovery under the

tort of IIED.  Id. at 343.  If reasonable persons could differ on the question, the issue whether the conduct is sufficiently extreme and outrageous is for the jury.  Id.

The Court has already found that the conduct of which Daly complains is not sufficiently pervasive or severe to survive summary judgment on claims of hostile environment sexual harassment.  For these same reasons, the Court finds that Daly's evidence fails to show conduct that is sufficiently outrageous in character and extreme in degree as to go beyond all possible bounds of decency.  The facts shown by Daly fall short of conduct that is atrocious and utterly intolerable in a civilized society.  No reasonable jury could find that this conduct was sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress.  Defendants are therefore entitled to summary judgment on Daly's claim for intentional infliction of emotional distress in Count XVII.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment as to All Claims by Moira Daly [Docket No. 127] is GRANTED IN PART as follows:

1.      Judgment is GRANTED in favor of Defendants on Plaintiff Daly's claim for interference with a business advantage in Count twenty-six (XXVI).

2.      Judgment is GRANTED in favor of Defendants on Plaintiff Daly's contract claims in Counts nineteen (XIX), twenty (XX) and twenty-one (XXI).

3.      Judgment is GRANTED in favor of Defendants on Plaintiff Daly's retaliatory discharge claim in twenty-two (XXII).

4.      Judgment is GRANTED in favor of Defendants on Plaintiff Daly's claims for false light and defamation in Counts twenty-three (XXIII) and twenty-four (XXIV).

5.     Judgment is GRANTED in favor of Defendants on Plaintiff Daly's claims under Title VII and the New Mexico Human Rights Act for hostile work environment sexual harassment in Counts eight (VIII) and eleven (XI).

6.     Judgment is GRANTED in favor of Defendants on Plaintiff Daly's claim for Civil Conspiracy in Count twenty-five (XXV).

7.     Judgment is GRANTED in favor of Defendants on Plaintiff Daly's claim for Aiding and Abetting under the New Mexico Human Rights Act in Count fourteen (XIV).

8.     Judgment is GRANTED in favor of Defendants on Plaintiff Daly's claim for Intentional Infliction of Emotion Distress in Count seventeen (XVII).

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment as to All Claims by Moira Daly [Docket No. 127] is DENIED IN PART as follows:

9.     Defendant's motion is DENIED with regard to Plaintiff Daly's claims under Title VII and the New Mexico Human Rights Act for sexual harassment in Counts seven (VII) and ten (X).

10.    Defendant's motion is DENIED with regard to Plaintiff Daly's claims under Title VII and the New Mexico Human Rights Act for disparate treatment in Counts six (VI) and nine (IX).

_____
UNITED STATES DISTRICT JUDGE