## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

———————

ROSANN WILLIAMS, et al.,

     Plaintiffs,

v.                                Civil No. 03-1195 WJ/ACT

W.D. SPORTS N.M., INC., et al.,

     Defendants.

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS BY ROBERT HADDOCK

     THIS MATTER comes before the Court pursuant to Defendants' Motion for Summary Judgment as to All Claims by Robert Haddock [Docket No. 125].

**BACKGROUND**

     Defendant W.D. Sports N.M., Inc. d/b/a The New Mexico Scorpions (W.D. Sports) is a professional hockey team that plays in Albuquerque, New Mexico. At all times relevant to this case, Defendant William Douglas Frank was the president of W.D. Sports. Defendant Patrick J. Dunn was the General Manager (GM) of the hockey team in the Spring of 2001 and became head coach in April 2002.[1] Dan Burgers replaced Dunn as GM in April 2002 when Dunn became head coach. Defendant Tyler Boucher was assigned in July 2001 to assist in sales. He eventually became Assistant to the President. Defendant Bruce Levine was hired as comptroller, CPA and lawyer after all but one plaintiff, Plaintiff Marquart, had left the organization.

---

     [1]At some time subsequent to the events in this case, Mr. Dunn transferred to Texas.

Plaintiff Haddock began working for W.D. Sports as a sales representative in September 2001.  According to Haddock, Defendant Dunn promised him employment for the hockey season and promised him sales accounts, access to a ticket information database, and the use of a desk, cell phone and a computer.  After Haddock had been hired, but before he reported for work, Plaintiff Hunter overheard Defendant Boucher talking about Haddock's employment and saying, "they hired that dork Rob Haddock.  That's just what we need, a black guy in this office."  Also before Haddock reported to work, Defendant Dunn approached Hunter and asked her whether she was going to have any problem working with Haddock given that he is black.

At some point during Haddock's employment in the sales office, Defendant Dunn's desk phone was broken.  Dunn took Defendant Boucher's because Boucher was out of the office at the time.  When Boucher returned, Dunn returned Boucher's phone and took Haddock's phone.  Thus, Haddock had no phone with which to make sales calls.

Haddock's workspace was initially located in the sales office with Boucher and another employee, Nancy Montoya.  There were two phones and two computers in this office.  Haddock claims he was not provided a desk, a phone or a computer with access to the ticket information database.  Sometime during his employment with W.D. Sports, Haddock became an assistant coach.  Haddock's desk was moved out of the sales office and into an office downstairs that he shared with Coach Tony Martino.  Mr. Haddock was not consulted about his desk being moved.  He alleges that items related to potential sales were missing from his desk after the move.  He also states that his phone calls, including calls on the sales rotation, were not getting to him at his new extension for approximately two weeks after the move.  Haddock does not know who was responsible for moving his desk.  Nancy Montoya admits to moving Haddock's desk and states

that she was not directed by anyone to do this.  Plaintiff Hunter testified by affidavit that she observed Defendant Boucher moving Haddock's belongings from his desk in the sales office to a location downstairs, and that she did not observe Nancy Montoya involved in moving Haddock's workspace.

Haddock was apparently provided a computer at some point during his employment with W.D. Sports.  He alleges that his computer was sent out for repair and was never returned to him.

Haddock alleges that his business cards frequently disappeared from a display of sales staff business cards at the front desk.  Plaintiff Daly testified at her deposition that she once saw Defendant Boucher remove Haddock's business cards from the display and replace them with his own.  Plaintiff Marquart testified at her deposition that she saw Boucher do this on 15 to 20 occasions.  Plaintiff Hunter saw Boucher pick up sales calls at Haddock's phone and heard Boucher yell at the receptionist for directing sales calls to Haddock.

Haddock was promised a cell phone when he began working at W.D. Sports.  Other sales persons had cell phones.  Haddock never received a cell phone even after repeated requests. Dunn apparently told Haddock that W.D. Sports' cellular contract only permitted a certain number of cell phones, and all of the cell phones were currently in use.   According to Haddock, at least one employee who had a cell phone left employment with W.D. Sports while Haddock was still there, and Haddock was still not given a cell phone.  Haddock obtained his own cell phone and was reimbursed by W.D. Sports for the use of this phone.

Haddock was given menial tasks that he believed had nothing to do with his job.  He was asked to go pick things up, go make copies for others when the copy machine in the office was not working, and haul boxes and promotional material from one place to another.

3

According to Defendants, Haddock did not complain to Defendants about any of the conduct he now alleges was discriminatory.  Haddock disputes this and states that he did complain to Defendant Dunn about not being given a cell phone.  He also points out that others complained on his behalf.  For instance, Ms. Marquart complained to Defendant Dunn after witnessing Defendant Boucher sweep Haddock's business cards from the front desk.

During his employment with W.D. Sports, Haddock was paid a commission on all of the ticket sales he made.  Haddock had a base annual salary of $18,000 with eight percent commission on new ticket sales and four or five percent on ticket renewals.  Defendant Boucher had a base annual salary of $26,000 or $28,000 with a ten percent commission on ticket sales.  Haddock was originally hired at his salary and commission rate to do sales and later became an assistant coach without any change in his pay structure.  In December 2001, Haddock began playing for the Scorpions hockey team in addition to his other duties.  His standard player agreement indicates he received $450 per week as a player, but it is unclear from the record whether this pay was in addition to his compensation for sales and coaching.  Boucher was originally hired as a community relations person and later added sales to his responsibilities with his pay structure changing only to add commissions.  Dunn stated in his deposition that Haddock was seemingly underpaid at his base salary once he took on responsibilities for coaching, but that he chose to start coaching and was not directed to do so by Dunn.

Haddock was fired from employment with W.D. Sports on March 2, 2002.  Then head coach Tony Martino told Haddock that his services were no longer needed.  Martino told Haddock that a meeting had been held that morning, that he (Martino) had been outvoted in the decision that Haddock's services were no longer required, and that Defendants Frank and Dunn

had been the persons at the meeting who had voted to discharge Haddock.  He was not told a reason why he was let go other than that his services were no longer required.

After Haddock was fired, he learned from others that Defendant Boucher had referred to him as a "nigger" outside his presence.  Equipment Manager Darren Hutchins heard Boucher refer to Haddock as a "fucking nigger."  When Boucher found out Plaintiff Williams was letting Haddock help her with her sales, he asked her why she was helping that "nigger."  Haddock was not aware of any of these incidents during his employment.

When Haddock was released as a player by the Scorpions in March 2002, he was picked up by another hockey team as a player almost immediately on March 5, 2002.  However, Haddock applied for coaching jobs with other teams and was never offered a job as a coach.

Haddock claims that he experienced severe emotional distress while employed with W.D. Sports due to the series of events listed above including the "covert" moving of his workplace from the sales office to the coaching office and his computer being sent out for repair and never being returned.  He alleges he experienced emotional distress when he learned that he had been called a "nigger" behind his back.  Finally, he claims he experienced severe emotional distress over the loss of his job.

Haddock filed his charge of discrimination with the EEOC on December 13, 2002.  This date is 300 days after sometime in mid-February 2002.

**LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). The burden of showing an absence of a genuine issue of material

fact falls upon the moving party. See Adler v Wal-Mart Store, Inc., 144 F.3d 664, 670 (10th Cir.

1998). However, when the moving party does not bear the ultimate burden of persuasion at trial,

it may satisfy its burden at the summary judgment stage by pointing out to the Court that there is

an absence of evidence to support the nonmoving party's case. Celotex Corp. v Catrett, 477 U.S.

317, 322-23 (1986); Adler, 144 F.3d at 671. The nonmoving party must then go beyond the

pleadings and designate specific facts showing that there is a genuine issue for trial sufficient to

support a verdict for the nonmovant. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248-49

(1986). The nonmovant cannot satisfy its burden with conclusory allegations. Lujan v. National

Wildlife Federation, 497 U.S. 871, 888 (1990). All reasonable factual inferences must be drawn

in favor of the nonmoving party. Seamons v Snow, 206 F.3d 1021, 1026 (10th Cir. 2000); Curtis

v Oklahoma City Public Sch. Bd. of Ed., 147 F.3d 1200, 1214 (10th Cir. 1998).

**DISCUSSION**

I.     HADDOCK'S RETALIATION CLAIMS, CONTRACT CLAIMS, CLAIMS FOR
       DEFAMATION AND FALSE LIGHT, AND CLAIM FOR INTERFERENCE WITH A
       BUSINESS ADVANTAGE

       Haddock's Response to Defendants' Motion for Summary Judgment indicates his consent

to the dismissal of his retaliation claims in Counts twelve (XII) and twenty-two (XXII), his

contract claims in Counts nineteen (XIX), twenty (XX) and twenty-one (XXI), his claims for

defamation and false light in Counts twenty-three (XXIII) and twenty-four (XXIV), and his claim

for interference with a business advantage in Count twenty-six (XXVI). Accordingly, Defendants

are entitled to judgment with regard to these claims.

II.    HADDOCK'S CLAIMS UNDER TITLE VII AND 42 U.S.C. § 1981

A.      Are Haddock's Title VII and Section 1981 Claims Barred If He Failed to
        Complain to Management About Alleged Discrimination?

Defendants argue that Haddock's Title VII and Section 1981 claims are barred because he

failed to complain to management about the alleged discrimination.  In support of their

proposition, Defendants cite to Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).  Neither of these cases suggest that an

employee's failure to complain about discrimination is a bar to a claim under Title VII.  Rather,

these cases provide an employer with an affirmative defense to Title VII claims under certain

circumstances.  In those circumstances where the affirmative defense may be used, the employer

has the burden of showing "(a) that the employer exercise reasonable care to prevent and correct

promptly any [discriminatory] behavior, and (b) that the plaintiff employee unreasonably failed to

take advantage of any preventive or corrective opportunities provided by the employer or to avoid

harm otherwise."  Ellerth, 524 U.S. at 765.

Defendants' argument ignores the fact that they bear the burden of proving the affirmative

defense set forth in Faragher and Ellerth.  Defendants' argument also skips the first element of the

defense - a showing that W.D. Sports took reasonable care to prevent and correct discrimination -

and asserts that Defendants are entitled to summary judgment based solely on a showing that

Haddock failed to complain of discrimination.[2]  Defendants' argument is a misstatement of the

law and is without merit.

B.      Haddock's Disparate Treatment Claim Under Title VII in Count II and Under
        Section 1981 in Count I

_____

[2]Haddock disputes Defendants' contention that he did not complain of discrimination.

7

Disparate treatment discrimination occurs when an employer treats an employee less favorably than others on the basis of that employee's race, gender or some other protected characteristic.  Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993).  The three-stage McDonnell Douglas burden shifting analysis applies to claims of discrimination under Title VII and 42 U.S.C. § 1981 when no direct evidence of discrimination exists.  See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1315-16 (10th Cir. 1999) overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); Perry v. Woodward, 199 F.3d 1126 (10th Cir. 1999).  At the first stage, the plaintiff must prove a prima facie case of discrimination.  Perry, 199 F.3d at 1135.  Plaintiff establishes a prima facie case by showing that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Hysten v. Burlington N. and Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002).  With regard to Title VII equal pay claims, a plaintiff makes a prima facie case of discrimination by showing that he occupies a job similar to that of higher paid persons not within his protected class.  Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1363 (10th Cir. 1997).  If the plaintiff satisfies his burden and makes a prima facie showing, the burden shifts to the defendant to produce a facially legitimate, non-discriminatory reason for its actions.  Id.  If the defendant articulates a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to show that the defendant's proffered reason for the action is a pretext for discrimination.  Id.

There is no dispute that Haddock is black and is therefore a member of a protected class under Title VII.  Thus, Haddock has satisfied the first prong of the prima facie case of discrimination under Title VII and Section 1981.

The Tenth Circuit liberally defines the phrase "adverse employment action," Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998), and takes a case-by-case approach in determining whether a given employment action is adverse.  Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir. 1998).  In this circuit, conduct constitutes adverse employment action when it results in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Tran v. Trustees of the State Colleges in Colo., 355 F.3d 1263 (10th Cir. 2004); Wells v. Colorado Dept. of Transp., 325 F.3d 1205, 1213 (10th Cir. 2003); Garcia v. Pueblo Country Club, 299 F.3d 1233, 1241 (10th Cir.2002); Aquilino v. Univ. of Kan., 268 F.3d 930, 934 (10th Cir. 2001).  Ultimately, action is adverse employment action if it constitutes a significant change in employment status.  Sanchez, 164 F.3d at 532.  The guiding principal in the Court's case-by-case analysis is that an adverse employment action is one that alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects his status as an employee.  Heno v. Spring/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2000). However, actions by an employer are adverse employment actions only when they have a demonstrable adverse impact on future employment opportunities or when they adversely affect an employee's job position.  See Berry v. Stevinson Chevrolet, 74 F.3d 980, 986 (10th Cir. 1996); McKenzie v. Atlantic Richfield Co., 906 F.Supp. 572, 575 (D. Colo. 1995).  An

employer's decision is not an adverse employment action just because an employee dislikes it or disagrees with it.  See Meredith v. Beech Aircraft Corp., 18 F.3d 890, 896 (10th Cir. 1994).

Haddock's claims appear to be that he suffered adverse employment action in having his desk phone taken away, having his desk moved, being given no access to a computer, not being given a cell phone, having his belongings go missing, having his business cards disappear, and being assigned menial tasks.  He also alleges an adverse employment action in being referred to as a "nigger" by a fellow employee.  He alleges that he was paid less than an employee in a similar position who was not black.  Finally, he alleges an adverse employment action in being fired.

Defendants urge that Haddock's claim of disparate treatment must fail to the extent it relies on any actions other than the termination of his employment because Haddock does not specify dates that these alleged events occurred and most of them likely occurred prior to 300 days before Haddock filed his EEOC charge.  Haddock responds that his claim is not barred because the continuing violation doctrine saves his claim.

The continuing violation doctrine applies only to hostile environment claims.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 115-17 (2002).  Therefore, the doctrine cannot save Haddock's disparate treatment claim to the extent it relies on conduct falling outside the 300 days prior to his EEOC filing.  However, timely filing of an EEOC charge is not jurisdictional and is subject to waiver.  Morgan, 526 U.S. at 113.  Defendant W.D. Sports' Answer includes several affirmative defenses for failure to exhaust administrative remedies but includes Haddock's EEOC filing only to the extent Haddock alleged claims against Defendant Levine.  See Docket No. 8, Third Affirmative Defense.  Therefore, W.D. Sports has waived any argument that Haddock's EEOC charge was not timely filed with regard to his claims against

Defendants other than Defendant Levine.  In any event, Haddock's claim is brought pursuant to 42 U.S.C. § 1981 in addition to Title VII, and Section 1981 claims do not have to be exhausted by the filing of an EEOC charge.  Aramburu v. Boeing Co., 112 F.3d 1398, 1410 n.9 (10th Cir. 1997).

Being fired is an adverse employment action.  Being paid less than an employee in a similar position who is outside a protected class is an adverse employment action.  See Sprague, 129 F.3d at 1363.  Haddock did not learn until after his employment ended that he had been referred to as a "nigger" by a fellow employee.  As such, the use of the word could not have altered the compensation, terms, conditions, or privileges of Haddock's employment, or adversely affected his status as an employee.  Therefore, this was not an adverse employment action in this case.[3]  Cf. Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995).

Haddock's allegations that his workspace was moved, that he had to share computers, desks and other equipment with coworkers, that his computer was taken for repairs and never returned, that he was not given a cell phone, that a co-worker removed his business cards from the front desk, that some of his belongings were missing after his workspace was moved, and that he was asked to make copies for others, pick things up, and deliver promotional materials might not amount to adverse employment actions in other contexts.  However, Haddock was working primarily in sales with a relatively low salary and a potential to earn most of his money through commissions.  Under these circumstances, depriving him of the time and tools necessary to make ticket sales may have affected the terms and conditions of his employment and may have had an

---

[3]This conclusion has no bearing on the relevance of the use of this word on the issue of intent.

11

adverse impact on his employment.  Thus, Haddock has satisfied the second prong of his prima facie case of discrimination.

Defendants argue that Haddock cannot satisfy the third prong of his prima facie case with regard to his termination because he cannot show that his termination occurred under circumstances giving rise to an inference of discrimination in that he was not told the reason for his discharge.  This position overstates Haddock's burden at the prima facie stage.  Haddock's prima facie case for discriminatory discharge is made by showing that he was qualified for his job and that his job was not eliminated after his discharge.  Kendrick v. Penske Transp. Serv., Inc., 220 F.3d 1220, 1229 (10th Cir. 2000).  "The burden of establishing a prima facie case of disparate treatment is not onerous."  Brinkley-OBU v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994).  Haddock has met his burden of showing a prima facie case of discriminatory discharge.

Defendants, having argued that Haddock's claim for disparate treatment based on all of his allegations other than his termination are barred for failure to timely file an EEOC charge, and having argued that none of the other allegations amount to adverse employment actions, do not argue that Haddock failed to make a showing on the third prong of his prima facie case of disparate treatment based on these other allegations.  Accordingly, the Court will not further address Haddock's prima facie case and will assume that Defendants concede that Haddock has satisfied the third prong.

The burden thus shifts to Defendants to offer a legitimate, nondiscriminatory reason for Haddock's discharge, Haddock's disparate pay and the other alleged adverse employment actions.  Defendants do not reach this issue in their motion for summary judgment.  Therefore, they are not

12

entitled to summary judgment with regard to Haddock's claim of disparate treatment under Title VII and 42 U.S.C. § 1981.

Defendants' Reply brief argues that Haddock has provided no evidence that either Defendant Dunn or Frank was responsible for any of the alleged discriminatory acts. This argument was not raised in Defendants' Memorandum in support of their motion for summary judgment. Even if the issue had been properly raised, Haddock's disparate treatment claims rest in part on his discharge from employment and his alleged unequal pay, and the evidence suggests that Defendants Frank and Dunn were involved in decisions regarding Haddock's pay and termination. Accordingly, these individual Defendants are not entitled to judgment with regard to Haddock's disparate treatment claim under 42 U.S.C. Section 1981.

C.   Haddock's Hostile Environment Claim Under Title VII in Count III and Under Section 1981 in Count I

To survive summary judgment on a claim of a racially hostile work environment, Haddock must show that "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." Trujillo v. Univ. of Colorado Health Sciences Ctr., 157 F.3d 1211, 1214 (10th Cir. 1998). "In evaluating the first prong of a hostile work environment claim, [a court] look[s] to all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (internal quotations and citations omitted). Pervasiveness and severity are independent and equal grounds on which to support a claim of a racially hostile work

environment.  Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998).  Even if not

pervasive, incidents of racial harassment may be sufficiently severe as to alter the conditions of

Haddock's employment and create a hostile work environment.  Id.  The pervasiveness and

severity inquiry is not a counting measure and instead requires an analysis of the totality of the

circumstances.  See Rodriguez v. America Online, Inc., 183 F.Supp.2d 1340, 1350 (D.N.M.

2001) (citing Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1415 (10th Cir. 1997)).

The incidents must be both objectively and subjectively severe from the perspective of a

reasonable person in the plaintiff's position. Id.; McCowan v. All Star Maintenance, Inc., 273

F.3d 917, 923 (10th Cir. 2001).  "The severity and pervasiveness evaluation is particularly

unsuited for summary judgment becasue it is quintessentially a question of fact."  McCowan, 273

F.3d at 923.

      Haddock's claim of a racially hostile work environment rests on his allegations that he was

not provided a desk; the phone on his desk was removed; his desk was moved; his access to

computers was limited because he had to share a computer, had no computer or because his

computer was out for repair; the failure of W.D. Sports to provide him with a cell phone; some of

his belongings disappeared after his desk was moved; his business cards disappeared from the

front desk; he was asked to make copies for others; he was asked to pick things up for others; he

was asked to pick up and deliver promotional items; and he was referred to as a "nigger" by

Defendant Boucher on more than one occasion.

14

If Boucher used the word "nigger" with regard to Haddock or in regard to nearly anyone or anything, his conduct was deplorable to a degree defying adequate description.[4]  However, Haddock was not aware that Boucher had used this word with regard to him until after his employment was terminated.  Thus, the use of the word by Boucher could not have contributed to the abusiveness of the work environment from Haddock's perspective during his tenure at W.D. Sports.[5]  See Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995).

Haddock's evidence suggests that within a seven month period of time, Haddock's workplace was moved without his prior knowledge and that sales information disappeared from his desk during the move.  His evidence further suggests that he was deprived of a desk phone for a period of time and that, after his workspace was moved, sales calls were not routinely directed to his extension downstairs for approximately two weeks.  Haddock alleges that he was not provided a desk during some of the seven months he was employed in sales and that he had limited access to a computer and the ticket sales database.  The evidence would tend to show that Defendants made somewhat frequent requests that he make copies and pick up items for others.

Haddock provides evidence that his business cards disappeared on multiple occasions from the front desk where persons walking in could select a ticket sales person to contact.  He has also shown that he was never provided a cellular telephone, and the evidence could be read to imply

---

[4]The word "nigger" is so disagreeable that this Court has had difficulty with its continued use in this Memorandum Opinion and Order.  However, to substitute it with some watered down reference would not truly diminish its negative impact, and the full impact of the word is crucial to an analysis of Haddock's claims.

[5]Again, the Court notes that this finding does not affect Haddock's ability to offer evidence of this conduct on the issue of intent.

15

that a cellular phone could have been made available in spite of Defendants' claim cellular

provider contract limitations.

Under the totality of the circumstances and considering the alleged harassing incidents

collectively, these incidents were sufficiently pervasive and severe to alter the terms, conditions,

or privileges of Haddock's employment.  The many incidents occurred over a relatively short

period of time.  Similarly, under the circumstances, a reasonable jury could find that these

incidents were sufficiently severe to alter the terms, conditions and privileges of Haddock's

employment.  Considered cumulatively, having limited access to computers, phones and a desk at

various times, having items related to potential sales disappear, having business cards disappear

from the front desk on multiple occasions, and being asked to run errands for others could have

altered the terms, conditions and privileges of Haddock's employment as a ticket sales

representative relying on commissions.  Accordingly, Defendants are not entitled to judgment

with regard to Haddock's hostile environment claim under Title VII and Section 1981.

III.    HADDOCK'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL
        DISTRESS

Defendants make three arguments in support of summary judgment on Haddock's claim

for intentional infliction of emotion distress (IIED).  Defendants first urge that the IIED claim is

actually an element of damages for Haddock's other claims rather than a separate claim.  Then,

assuming that Haddock's other claims fail at the summary judgment stage, Defendants contend

that the IIED damages must also fail.  Second, Defendants argue that, even if the IIED claim is

considered a separate claim rather than just a damages component of other claims, it must fail

because it is barred by the exclusivity provisions of the New Mexico Worker's Compensation Act.

16

Finally, Defendants contend that Haddock has failed to support the claim because the facts do not show sufficiently outrageous behavior for an IIED claim and because Haddock has failed to show that he experienced severe emotional distress.

Defendants' first two arguments are easily rejected.  There is no legal support for the argument that IIED is a component of damages rather than a distinct legal claim.  While emotional distress is a component of damages for many claims, New Mexico has unequivocally recognized a separate claim for the tort of IIED.  See Dominguez v. Stone, 638 P.2d 423, 426 (N.M. App. 1981).  Defendants' contention that an IIED claim is barred by the exclusivity provision of the Worker's Compensation Act (WCA) is equally without merit.  Injuries cause by workplace harassment do not arise out of employment and are not covered by the WCA.  See Coates v. Wal-Mart Stores, Inc., 976 P.2d 999, 1005 (N.M. 1999).  Accordingly, the exclusivity provision of the WCA does not preclude an employee from seeking a remedy outside the WCA for injuries caused by workplace harassment.  Id.

In order to establish a claim for IIED, a plaintiff must show that (1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the plaintiff's mental distress.  Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 P.3d 333, 342 (N.M. 2001).  Extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Id. (citing Restatement (Second) of Torts § 46 cmt. d).  To show extreme and severe emotional distress sufficient to recover on a claim for IIED, a plaintiff must provide

17

evidence of emotional distress of such an intensity and duration that no ordinary person would be expected to tolerate it.  Id. at 343.  N.M. UJI 13-1628.  "Severe emotional distress means that a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances."  Trujillo, 41 P.3d at 343.  "The law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it." Id.

In Trujillo, the plaintiff provided evidence that he was offended when he was fired, that he felt lousy and depressed and that he was prescribed an anti-depressant.  He also provided evidence that he started sleeping long hours and had erratic eating habits after he was fired.  The New Mexico Supreme Court held that the plaintiff's evidence was insufficient as a matter of law to support the view that the emotional distress experienced by the plaintiff was severe.  Id. at 343.

Even if the Defendants' alleged conduct was sufficiently extreme and outrageous to meet the first element of an IIED claim, Haddock would still be required to meet the other elements, including a showing of severe emotional distress.  Haddock's only evidence concerning his emotional distress is his testimony that he was "emotionally distressed" during his employment at W.D. Sports due to the events that occurred at that time, that he found being called a "nigger" behind his back to be "even more hurtful," that he was "upset" about being fired, that he experienced coldness from Scorpions fans after he left Albuquerque, that he was booed by Albuquerque hockey fans as he skated onto the ice as a player for an opposing team, that his friendships with other Scorpions players became strained after he was terminated, that he stopped being a "visible member of the society in Albuquerque," and that he felt the cards were continually stacked against him during his tenure with W.D. Sports.  This evidence is even less compelling

18

than that of the plaintiff in <u>Trujillo</u>.  Unlike the plaintiff in <u>Trujillo</u>, Haddock offers no evidence he suffered depression, received medication for depression or that his emotional distress had any effect on his daily life such as his sleeping or eating habits.  Haddock's evidence  shows his subjective impression that he was emotionally distressed.  This falls short of showing that he experienced emotional distress that a reasonable person  could not be expected to endure.  While the Court does not intend to disregard Haddock's subjective belief that he has suffered emotional distress, the Court nevertheless finds that Haddock's evidence is insufficient as a matter of law to show severe emotional distress.  Defendants are therefore entitled to summary judgment on Haddock's claim for intentional infliction of emotional distress in Count XVII.

IV.     HADDOCK'S CLAIM FOR CIVIL CONSPIRACY

       To establish a claim for civil conspiracy, a plaintiff must demonstrate that (1) a conspiracy between two or more individuals existed; (2) specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) plaintiff was damaged as a result.  <u>Ettenson v. Burke</u>, 17 P.3d 440 (N.M. App. 2000).  An actionable civil conspiracy must involve a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  <u>Las Luminarias of the New Mexico Council of the Blind v. Isengard</u>, 587 P.2d 444, 447 (N.M. App. 1978).  The existence of a civil conspiracy must be pled by direct allegations or by allegations of circumstances from which a conclusion of the existence of a conspiracy may be reasonably inferred.  <u>Id.</u>  The circumstances, considered as a whole, must create a genuine issue of material fact regarding an agreement among the alleged conspirators.  <u>Morris v. Dodge Country, Inc.</u>, 513 P.2d 1273, 1274 (Ct. App. 1973).

19

Defendants argue that Haddock has no evidence of concerted action among any of the Defendants and thus fails to create a genuine issue of material fact with regard to all of the essential elements of a civil conspiracy claim.  In response, Haddock gives a conclusory statement that, "This was concerted abuse between Mr. Boucher, Mr. Dunn and Mr. Frank, who ultimately ratified Mr. Haddock's termination.  These were not merely corporate acts, but also individual acts by Defendant Boucher and Defendant Dunn and ultimately Defendant Frank, who as the president and shareholder, is jointly liable for his participation in the abuse and removal of Mr. Haddock."  See Docket No. 140 p. 13.

On summary judgment, the movant may meet its Rule 56 burden by pointing out to the court that the nonmovant "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322-23.  Once a movant has met its burden of pointing out that the nonmovant has failed to show the existence of an element essential to his case, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-7 (1986).  To meet his burden, the nonmovant must "designate specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324. The nonmovant cannot satisfy its burden with conclusory allegations.  Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

Haddock's conclusory statement in response to Defendants' motion for summary judgment on the civil conspiracy claim falls short of meeting his burden of establishing the existence of a genuine issue for trial.  Haddock made no efforts to designate specific facts showing a genuine issue for trial on each of the elements of a civil conspiracy claim, and the Court

20

will not comb through the voluminous record in this case searching for evidence to support the claim.  See Sandoval v. City of Boulder, Colo., 388 F.3d 1312, 1320 (10th Cir. 2004) (a court is not obligated to comb through the summary judgment record and make a party's case for him). Consequently, Defendants are entitled to summary judgment with regard to Haddock's Civil Conspiracy claim in Count XXV.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment as to All Claims by Robert Haddock [Docket No. 125] is GRANTED IN PART as follows:

1.  Judgment is GRANTED in favor of Defendants on Plaintiff Haddock's claim for retaliation under Title VII in Count twelve (XII);

2.  Judgment is GRANTED in favor of Defendants on Plaintiff Haddock's claim of retaliatory discharge in Count twenty-two (XXII);

3.  Judgment is GRANTED in favor of Defendants on Plaintiff Haddock's breach of contract claim in Count nineteen (XIX);

4.  Judgment is GRANTED in favor of Defendants on Plaintiff Haddock's claim for breach of implied contract in Count twenty (XX);

5.  Judgment is GRANTED in favor of Defendants on Plaintiff Haddock's claim for breach of the covenant of good faith and fair dealing in Count twenty-one (XXI);

6.  Judgment is GRANTED in favor of Defendants on Plaintiff Haddock's claim for false light in Count twenty-three (XXIII);

7.  Judgment is GRANTED in favor of Defendants on Plaintiff Haddock's claim for defamation in Count twenty-four (XXIV);

8.      Judgment is GRANTED in favor of Defendants on Plaintiff Haddock's claim for

        interference with a business advantage in Count twenty-six (XXVI).

9.      Judgment is GRANTED in favor of Defendants on Plaintiff Haddock's claim for

        intentional infliction of emotional distress in Count seventeen (XVII).

10.     Judgment is GRANTED in favor of Defendants on Plaintiff Haddock's claim for

        civil conspiracy in Count twenty-five (XXV).

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment as to All

Claims by Robert Haddock [Docket No. 125] is DENIED IN PART as follows:

11.     Defendants' Motion is DENIED with regard to Plaintiff Haddock's disparate

        treatment claim on the basis of race under Title VII in Count two (II) and under 42

        U.S.C. § 1981 in Count one (I).

12.     Judgment is DENIED with regard to Plaintiff Haddock's claim for hostile work

        environment under Title VII in Count three (III) and under 42 U.S.C. § 1981 in

        Count one (I).


_____

UNITED STATES DISTRICT JUDGE