IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO
_____

ROSANN WILLIAMS, et al.,

     Plaintiffs,

v.                                   Civil No. 03-1195 WJ/ACT

W.D. SPORTS N.M., INC., et al.,

     Defendants.


**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AS TO ALL CLAIMS BY ROSANN WILLIAMS**

     THIS MATTER comes before the Court pursuant to Defendants' Motion for Summary

Judgment as to All Claims by Rosann Williams [Docket No. 121].

**BACKGROUND**

     Defendant W.D. Sports N.M., Inc. d/b/a The New Mexico Scorpions (W.D. Sports) is a

professional hockey team that plays in Albuquerque, New Mexico.  At all times relevant to this

case, Defendant William Douglas Frank was the president of W.D. Sports.  Defendant Patrick J.

Dunn was the General Manager (GM) of the hockey team in the Spring of 2001 and became head

coach in April 2002.[1]  Dan Burgers replaced Dunn as GM in April 2002 when Dunn became head

coach.  Defendant Tyler Boucher was assigned in July 2001 to assist in sales.  He eventually

became Assistant to the President.  Defendant Bruce Levine was hired as comptroller, CPA and

lawyer after all but one plaintiff, Plaintiff Marquart, had left the organization.

---

[1]At some time subsequent to the events in this case, Mr. Dunn transferred to Texas.

Plaintiff Rosann Williams began working for W.D. Sports in 1999 before the team was purchased by its current ownership in 2001.  In May 2001, after the current ownership acquired the team, Williams was given a letter from Defendant Dunn indicating that she was being employed in the capacity of Senior Account Executive/ Community Relations.  The letter indicated she was to be paid an annual salary of $20,000 with 8% commission on new season ticket sales and group sales and 4% commission on season ticket renewals.  The letter also indicated she would receive health and dental benefits, two weeks vacation a year, and the use of a company cellular phone or pager.

No other staff at W.D. Sports had the identical job duties or title as Williams.  After Williams' employment ended, no single person took over her job responsibilities.  During Williams' employment with W.D. Sports after May 2001, Tyler Boucher was hired to assist in sales.  Comparing Williams' and Boucher's positions, Dunn testified by affidavit in May 2003 that they were both in sales but that Williams was also involved in player appearances and community relations while Boucher was not.  Dunn's testimony was that this was the only difference.  Boucher was paid an annual salary of $26,000 or $28,000 with 10% commission on ticket sales.  Boucher had use of a company car while Williams did not.  Boucher was also permitted to pay part of his personal rent by providing complimentary game tickets to his apartment complex.

During the league convention in the spring of 2001, the male staff members went out together, and the female staff members were not invited.  Female staff members were generally expected to work from 8:30 a.m. to 5:30 p.m.  One male staff member chuckled at this and said "we'll see about that."  Some of the women felt they were treated unequally when it came to taking a lunch break.  Defendant Frank took Defendant Dunn and another male employee on a

2

trip to Las Vegas.  None of the female staff were taken on such a trip.  Male staff and players were welcome to join Defendants at strip clubs.  Defendant Frank expressed concern in his deposition that it was improper for female staff to go to ordinary nightclubs with the players in their off duty hours.  When women complained of disparate treatment, Defendant Dunn's reaction was "I'll take care of it" or "I don't want to deal with it right now."

Before the fall 2001 season began, Williams heard stories concerning Defendant Dunn who was the new GM at the time.  She heard he had "crapped" on a golf course fairway and that he had once taken a team owner's hairpiece, placed it over his pubic region, and danced around a hotel lobby.  Williams states that these stories embarrassed her.  She does not designate the source of these stories.

At a party held at Plaintiff Daly's house, Defendant Boucher tried to kiss Williams.  Boucher was not Williams' supervisor.  At work, Williams overheard a co-worker, Darren Hutchins, compliment Boucher regarding a photo of Boucher's wife on Boucher's desk.  Williams then heard Boucher ask Hutchins if Hutchins wanted to lift his wife's skirt and "lick her pussy."

Williams heard Defendant Dunn talk about a girl who had posed for Playboy magazine.  Dunn wanted to get a copy of the magazine to show everyone.  Williams heard Dunn talk about a trip he had taken and some interactions with prostitutes on that trip.  Williams on various occasions heard Dunn refer to women as "slits," "peelers," and "donkeys."[2]

---

[2]Plaintiff interprets the term "slits" as referring to the female genitalia. The term "peelers" refers specifically to female exotic dancers.  According to Plaintiff, the term "donkey" has negative female connotations, and when used with regard to a man has additional negative connotations because he is being referred to as a woman.

After the previously mentioned trip to Las Vegas, Williams overheard Dunn and another male discussing the trip.  They talked of using prostitutes and joked about Defendant Frank passing around Viagra.  When Defendant Frank interviewed Defendant Burgers for employment, Williams overheard them making a comment about women's breasts.

During a hockey game, Williams was walking down a hallway with some interns.[3]  In her presence, Defendants Dunn and Boucher chased a player from the opposing hockey team into the opposing team's locker room.  Dunn and Boucher called the player a pussy and a donkey and threatened to "fuck him in the ass."

The Scorpions' team captain called Williams a "fucking cunt" and a "fucking bitch" in the office on more than occasion.  Williams learned that he also called her names behind her back on several occasions.  He encouraged hockey players not to attend promotions set up by Williams.

The Scorpions' equipment manager called Williams names to her face and behind her back.  He also hung up on her.  Williams generally complained about the behavior of the equipment manager, and Defendant Dunn got word of these complaints.

Some male employees teased Williams about being paid less than male staff.  Williams, who had not previously been aware that her pay was less, confronted Dunn with this information.  Dunn confirmed that she was being paid less.

Williams heard about altercations between Boucher and other female employees in which Boucher called these women "fucking bitches."   At a staff meeting in late November 2001, Defendant Boucher screamed at Williams in front of Defendants Dunn and Frank and several

---

[3]According to Plaintiffs, these were high school interns who were approximately seventeen years old.

4

other employees.  He called Williams a "fucking bitch" and a "fucking liar."  The only apparent

reaction to this incident by Frank was a comment to Boucher that "you're exactly what we need

here."[4]  Williams had an anxiety attack after the staff meeting.  Such anxiety attacks have

continued to the present.

Following the November 2001 staff meeting, Boucher began calling Williams names on a

frequent basis.  He did this to her face, as an aside when walking past her, and when talking with

others within her hearing.  Williams testified that Boucher never missed an opportunity to call her

a foul name.  The names he called her on these innumerable occasions included "fucking liar,"

"fucking cunt," "fucking bitch," and "donkey."

At some point while Williams was working at W.D. Sports, rumors about Williams began

to spread.  These rumors indicated that Williams had engaged in sex with Scorpions players.  By

February and March of 2002, Williams was crying at work almost daily.

By March 2002, Williams and others received warnings from male staff that Defendant

Frank had announced he was going to get rid of the "fucking bitches" at the end of the season.

Williams approached Frank about this rumor, and Frank initially assured her that her job was not

in jeopardy.  Williams then learned that Frank had offered a Scorpions hockey player a community

relations position.  When she asked Frank about this, he confirmed the offer and said he had not

been thinking about her role in community relations in making the offer.  Williams ended up

crying in Frank's office.

---

[4]The parties dispute the context in which Frank made this statement.  Plaintiffs contend
this statement was made in support and defense of Boucher in spite of his tirade.  Defendants, to
the extent such a statement was actually made, urge that it was made after Boucher became
remorseful and had expressed the belief that none of the women liked him.  Defendants also state
that Boucher was privately given an oral reprimand by Frank.

Two days later, Frank called Williams into his office.  He raised the issue of the rumors that Williams was having sex with players.  He indicated that he did not believe the rumors were true but said he had received a letter about her and coach Tony Martino.  He told Williams that she needed to go home and take care of her husband and children.  Williams told Frank that she would not quit her job and asked that, if she was being fired, Frank give her the reasons for her discharge in writing.  Frank said that he would give her written reasons for her discharge as well as severance if she would sign a release of claims.  Williams refused to sign a release.  Frank responded that he did not have to give her anything in writing to fire her and told her to "get your shit and get the fuck out."  As Williams left, Frank threatened to ruin her marriage if she fought him over her discharge.  He remarked that "the rumors don't have to be true."

Williams had not used all her vacation time before her discharge.  She was not paid for any unused vacation time upon her termination.

After Williams left employment with W.D. Sports, Defendants told several season ticket holders that Williams was on vacation.  In an article appearing in the Albuquerque Journal on September 16, 2003, Defendant Frank was quoted as saying that the Plaintiffs in the instant lawsuit are disgruntled former employees.

After her termination, Williams applied for and began receiving unemployment compensation from the New Mexico Department of Labor (NMDOL).  Williams also filed a charge of discrimination with the New Mexico Human Rights Division on or about March 28, 2002.  After Defendants learned that Williams had filed a charge of discrimination, they submitted an Employer's Statement to the NMDOL challenging Williams' claim for unemployment benefits.  The statement was dated April 15, 2002.  It indicated that Williams had been terminated for

sexual misconduct with co-workers and subordinates amounting to sexual harassment, for use of alcohol, and theft of company property including proprietary information. The NMDOL held a hearing on Defendants' challenge. Prior to the hearing, Defendants' attorney at the time[5] approached Williams and offered to withdraw the challenge to her unemployment benefits if Williams would withdraw her charge of discrimination. Williams refused this offer. Defendants then submitted a position paper in response to Williams' charge of discrimination that included allegations that Williams had misappropriated proprietary information and had engaged in "improper, lascivious social conduct" with hockey players.

During her employment with W.D. Sports, Williams complained to both Dunn and Frank about incidents she believed were discriminatory or harassing. Defendants urge that Williams used profanity in the workplace and was a willing participant in conversations about sex or with sexual connotations. Williams denies these allegations.

Williams alleges that her experience at W.D. Sports continues to affect her on a daily basis. She clenches her jaw and grinds her teeth; experiences incidents in which she yells, screams, cries and throws things; has nightmares; has anxiety attacks; gets headaches; has difficulty getting out of bed; and has an aversion to leaving her house to go out in public. Williams has been diagnosed with Post Traumatic Stress Disorder and takes medication.

Williams and several other Plaintiffs filed a Complaint against Defendants that included twenty-six counts. Williams' claims included claims for gender discrimination disparate treatment under Title VII and the New Mexico Human Rights Act (NMHRA); claims for gender discrimination sexual harassment under Title VII and the NMHRA; claims for gender

---

[5]This attorney is not affiliated with the attorneys currently representing Defendants.

discrimination hostile work environment under Title VII and the NMHRA; claims for retaliation under Title VII and the NMHRA;  a claim for aiding and abetting under the NMHRA; a claim of intentional infliction of emotional distress; a claim under the Equal Pay Act; claims for breach of contract, breach of implied contract, and breach of the covenant of good faith and fair dealing; a claim for retaliatory discharge; and claims for false light, defamation, civil conspiracy, and interference with a business advantage.

Defendants filed the instant motion for summary judgment arguing that Williams' Equal Pay Act and disparate treatment claims must fail because there is no evidence that male staff doing equal work received higher pay.  Defendants urge that they are entitled to summary judgment with regard to  Williams' sexual harassment and hostile work environment claims because there is no evidence of quid pro quo sexual harassment and insufficient evidence to establish a hostile work environment claim.  Defendants seek summary judgment with regard to Williams' retaliation claims arguing that she cannot show protected activity, adverse action, or a causal connection. Defendants contend that they are entitled to  summary judgment with regard to Williams' claims for civil conspiracy and aiding and abetting because she can show no concerted action, common design or an agreement.  With regard to Williams' contract claims, Defendants contend they are entitled to summary judgment because there is no evidence of any employment contract between Williams and W.D. Sports that altered the presumed at will relationship.  Defendants assert that Williams' claim for retaliatory discharge must fail because Williams cannot show that she was discharged for any activity or refusal protected by New Mexico public policy.  Defendants urge that they are entitled to summary judgment on Williams' claim for interference with a business advantage because she has no evidence of a prospective business advantage and no evidence that

8

Defendants interfered with any business advantage.  With regard to Williams' claims for defamation and false light, Defendants argue they are entitled to summary judgment because statements in Defendants' submissions to the NMDOL and in response to Williams' charge of discrimination are absolutely privileged, the quote from the newspaper is a statement of opinion, and telling people that Williams was on vacation rather than telling them she had been fired is not defamatory.  Moreover, Defendants argue that Williams has no evidence of any damage to her reputation.  Finally, Defendants contend that Williams' claim for intentional infliction of emotional distress must fail because it is a component of damages rather than an independent claim, such claim is preempted by the exclusivity provisions of the New Mexico Worker's Compensation Act, and Williams cannot show sufficiently extreme or outrageous behavior on the part of Defendants to support the claim.

**LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The burden of showing an absence of a genuine issue of material fact falls upon the moving party.  See Adler v Wal-Mart Store, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  However, when the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by pointing out to the Court that there is an absence of evidence to support the nonmoving party's case.  Celotex Corp. v Catrett, 477 U.S. 317, 322-23 (1986); Adler, 144 F.3d at 671.  The nonmoving party must then go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial sufficient to

support a verdict for the nonmovant.  Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248-49

(1986).  All reasonable factual inferences must be drawn in favor of the nonmoving party.

Seamons v Snow, 206 F.3d 1021, 1026 (10th Cir. 2000); Curtis v Oklahoma City Public Sch. Bd.

of Ed., 147 F.3d 1200, 1214 (10th Cir. 1998).

**DISCUSSION**

I.     PLAINTIFF WILLIAMS' EQUAL PAY ACT CLAIM AND CLAIM OF
       INTERFERENCE WITH A BUSINESS ADVANTAGE

Williams' response to the motion for summary judgment indicates her consent to the

dismissal of her Equal Pay Act claim and her claim for intentional interference with a business

advantage.  Accordingly, Defendants are entitled to summary judgment with regard to Williams'

claims in Counts eighteen (XVIII) and twenty-six (XXVI).

II.    PLAINTIFF WILLIAMS' GENDER DISCRIMINATION CLAIMS

Williams' Title VII claims for gender discrimination include her claim in Count six (VI)

gender disparate treatment, Count seven (VII) for gender sexual harassment and Count eight

(VIII) for gender hostile environment.  Williams' New Mexico Human Rights Act (NMHRA)

claims for gender discrimination include Count nine (IX) for gender disparate treatment, Count

ten (X) for gender sexual harassment, and Count eleven (XI) for gender hostile environment.

Williams' factual allegations are similar in nature and degree to those made by Plaintiff

Hunter.  In addressing the motion for summary judgment with regard to Hunter's claims, the

Court analyzed Hunter's claims in order to differentiate them from one another.  See

Memorandum Opinion and Order filed October 28, 2004 [Docket No. 165].  The Court noted

that sexual harassment may be either a claim for hostile environment sexual harassment or quid

10

pro quo sexual harassment.  Williams, like Hunter, alleged a claim for hostile environment in Counts eight (VIII) and eleven (XI) separate from her claims of sexual harassment in Counts seven (VII) and ten (X).  These claims are duplicative of one another unless Williams intends the claims in Counts seven (VII) and ten (X) as claims for quid pro quo sexual harassment.

Quid pro quo sexual harassment involves a conditioning of tangible employment benefits upon the submission to sexual conduct.  Hicks v Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir. 1987).  Nothing in the facts alleged by Williams or the arguments made in response to summary judgment indicates a claim for quid pro quo sexual harassment.  Therefore, Judgment for Defendants is granted with regard to Williams' claims in Counts seven (VII) and ten (X).

Hostile work environment harassment occurs "where [sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating hostile or offensive working environment."  Meritor Sav. Bank, 477 U.S. at 65. From the facts alleged, supported and argued with respect to the Motion for Summary Judgment, there is no doubt that Williams intends a claim for hostile work environment sexual harassment.

There are two types of employment discrimination.  There is disparate treatment discrimination which occurs when an employer treats an employee less favorably than others on the basis of that employee's race, gender or some other protected characteristic.  Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993).  There is also disparate impact discrimination which occurs when a facially neutral employment practice has a greater negative impact on a protected class of employees and the practice is not justified by a business necessity.  Id.  Clearly, Williams' claims of hostile environment sexual harassment are brought under the disparate treatment theory of employment discrimination.  Thus, to the extent Williams' employment discrimination claims

11

are based on a hostile work environment, her disparate treatment claims in Counts VI and IX are superfluous in light of her claims in Counts VIII and XI.  Williams argues that, in addition to the hostile environment, she was treated differently than male employees because she was paid less and because men received more generous conditions of employment including special perquisites and a more flexible code of conduct.  Williams also alleges that she was discharged on the basis of her gender.  Thus, her disparate treatment claims in Counts VI and IX will be analyzed only on the basis of the alleged unequal pay and unequal benefits and terms of employment and her allegation that she was discharged on the basis of her gender.

A.      Plaintiff Williams' Claims of Disparate Treatment in Counts VI and IX

The three-stage McDonnell Douglas burden shifting analysis applies to claims of discrimination under Title VII when no direct evidence of discrimination exists.  See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1315-16 (10th Cir. 1999) overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  The same analysis is used for claims under the New Mexico Human Rights Act.  Martinez v. Yellow Freight Sys., Inc., 826 P.2d 962, 964-65 (N.M.1992).  At the first stage, the plaintiff must prove a prima facie case of discrimination.  Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999).  Plaintiff establishes a prima facie case by showing that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class. Sanchez v. Denver Pub. Sch., 164 F.3d 527, 531 (10th Cir.1998) (citations omitted).  With regard to Title VII equal pay claims, a plaintiff makes a prima facie case of discrimination by showing that she occupies a job similar to that of higher paid males. Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1363 (10th Cir. 1997).  If

12

the plaintiff satisfies her burden and makes a prima facie showing, the burden shifts to the defendant to produce a facially legitimate, non-discriminatory reason for its actions.  Id.  If the defendant articulates a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to show that the defendant's proffered reason for the action is a pretext for discrimination.  Id.

There is no dispute that Williams, as a woman, is a member of a protected class under Title VII.  There is also no dispute that she was qualified for her position.  What is disputed is whether Williams, for purposes of her disparate treatment claim, suffered an adverse employment action and whether she was treated less favorably than others not in her protected class.

The Tenth Circuit liberally defines "adverse employment action."  Sanchez, 164 F.3d at 532.  Ultimately, action is adverse employment action if it constitutes a significant change in employment status such as, but not limited to, hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  Id.  The guiding principal in the Court's case-by-case analysis is that an adverse employment action is one that alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects her status as an employee.  Heno v. Spring/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2000).

It is clear that being fired is an adverse employment action.  It is also clear that being paid less than male employees in similar positions and being given less generous benefits and perquisites than male employees in similar positions are adverse employment actions.  See Sprague, 129 F.3d at 1363.  Williams has provided sufficient evidence that she was terminated. She has also provided sufficient evidence that she was paid less than at least one male employee in

a similar position.  Defendants argue that Williams cannot show an adverse employment action with regard to her disparate pay claim because no male employee had her identical job responsibilities.  However, Williams need not compare her pay and benefits with males holding identical jobs.  The jobs need only be similar, and Williams has provided sufficient evidence that Boucher's job was similar to hers.  Therefore, evidence of Boucher's higher salary, higher commission, use of a company car, and other perquisites in comparison to Williams' pay and benefits are sufficient to show an adverse action.

With regard to Williams' allegations that she received less generous benefits, perquisites, and other conditions of employment, her evidence that male staff members went out together without inviting the female staff during a 2001 league convention does not show adverse action.  Nothing about the male staff members' choice to socialize with one another without the female staff resulted in a significant change in Williams' employment status or altered the compensation, terms, conditions, privileges or status of her employment.  The same is true with regard to Williams' evidence that male staff and players were welcome to join management at strip clubs while females were not.  While Williams alleges that male staff were treated more generously than female staff with regard to expected working hours, her evidence does not support this contention.  The only evidence Williams provides is that a male employee, upon hearing that staff were expected to work from 8:30 to 5:30, chuckled and said, "we'll see about that."  This evidence does not support an inference that male staff were not expected to work the same hours as female staff.  Williams' allegation with respect to lunch breaks is similarly unsupported.  Her evidence only shows that some of the women felt they were treated unequally when it came to taking a lunch break.  Williams' evidence that Defendant Frank took Defendant Dunn and another

14

male employee on a trip to Las Vegas while he never took female staff on similar trips will not support Williams' disparate treatment claim. Williams provides no evidence that she was similarly situated to Defendant Dunn or the other male invited on the Las Vegas trip.

Having shown adverse action in being discharged and in being paid less than a male in a similar job, Williams has succeeded in making out a prima facie showing of disparate treatment gender discrimination. The burden thus shifts to Defendants to show a legitimate, nondiscriminatory reason for their actions. Defendants' motion does not even address Williams' disparate treatment claim to the extent it is based on her discharge from employment. To the extent the claim is based on unequal pay, Defendants do not go beyond arguing that Williams cannot make out a prima facie case of discrimination. Therefore, Defendants have not met their burden at the summary judgment stage of showing legitimate, nondiscriminatory reasons for the adverse actions, and they are not entitled to summary judgment on Williams' claims in Counts six (VI) and nine (IX).

B.   Williams' Hostile Work Environment Sexual Harassment Claims in Counts VIII and XI.

Title VII forbids actions taken on the basis of sex that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." Faragher v. Boca Raton, 524 U.S. 775, 786 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)). Hostile work environment harassment occurs when unwelcome sexual conduct "'unreasonably interfer[es] with an individual's work performance or creat[es] an intimidating, hostile, or offensive working environment.'" Smith v. Norwest Financial Acceptance, Inc., 129 F.3d 1408, 1412 (10th Cir. 1997) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)); 29 C.F.R. S

1604.11(a)(3).  Meritor states that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"  477 U.S. at 67 (citation omitted).  There is no "mathematically precise test" for determining whether conduct is sufficiently severe or pervasive.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993).  Some factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 23.  "The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact."  McCowan v. All Star Maintenance, Inc., 273 F.3d 917, 923 (10th Cir. 2001).

The Tenth Circuit has stated that, "Our precedents, however, eschew ... a mechanical approach to analyzing hostile work environment claims."  Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998).  In  Meritor, the Supreme Court stated that the existence of sexual harassment must be determined "in light of the record as a whole," and the trier of fact must examine the totality of the circumstances, including "the context in which the alleged incidents occurred."  477 U.S. at 69 (quoting 29 C.F.R. S 1604.11(b) (1985)) (internal quotation marks omitted).  Indeed, the very term "environment" indicates that allegedly discriminatory incidents should not be examined in isolation.  Penry, 155 F.3d at 1261.  Thus, this Court must examine the totality of the circumstances in reviewing the summary judgment motion with regard to Hunter's hostile environment claims.  See, Davis v. U.S. Postal Svc.,142 F.3d 1334, 1341 (10th Cir. 1998); Smith, 129 F.3d at 1413.

The facts alleged and supported by Williams are similar to those alleged and supported by

Plaintiff Hunter in her response to Defendants' Motion for Summary Judgment as to All Claims

by Kaye Hunter [Docket No. 123].  Compare Memorandum Opinion and Order filed October 28,

2004 [Docket No. 165] (describing Hunter's allegations) with the facts described herein.

Additionally, many of the arguments made by Defendants in support of the instant motion for

summary judgment parallel those made in support of summary judgment on Hunter's claims.

Defendants' argument for summary judgment on Williams' hostile environment claims examines

individual statements and actions in piecemeal fashion.  For instance, Defendants argue that the

Court should ignore many of the allegedly harassing terms and names used by Boucher and others

because they are not inherently sexual and do not necessarily connote specific female

characteristics.  Defendants also urge that at least one incident should be ignored because,

although witnessed by Williams, the incident occurred solely among men and was not directed

specifically toward Williams.  According to Defendants, some of the incidents cannot be

considered because they occurred outside the work environment.  Finally, Defendants contend

that Williams has failed to raise a genuine issue of material fact as to whether she subjectively

perceived the work environment as abusive because the evidence shows that she failed to

complain about each the behavior and because she allegedly used profanity herself and engaged in

sexual conversations.

As previously noted, there are disputed issues of fact with regard to whether Williams was

a willing participant in any sexual conversations and whether Williams complained of allegedly

abusive incidents.  Additionally, Defendants' arguments ignore the totality of the circumstances.

Even if some of the alleged incidents, such as those occurring outside of the workplace, did not

contribute to the overall work environment, there are sufficient disputed facts with regard to the totality of the circumstances to preclude summary judgment on Williams' hostile work environment claims in Counts eight (VIII) and eleven (XI).  Defendants' motion for summary judgment with regard to these claims will consequently be denied.

III     PLAINTIFF WILLIAMS' CLAIMS FOR RETALIATION IN COUNTS XII AND XIII

Williams brings claims for retaliation under Title VII in Count twelve (XII) and under the NMHRA in Count thirteen (XIII).  The courts of the State of New Mexico have adopted the McDonnell Douglas burden shifting analysis for claims under the NMHRA.  See Martinez v. Yellow Freight Sys., Inc., 826 P.2d 962, 964-65 (N.M. 1992).  Thus, the same analysis applies to both Williams' retaliation claims.  Under the McDonnell Douglas burden shifting analysis, to survive summary judgment with a claim of retaliation, Plaintiff bears the initial burden of showing (1) that she engaged in protected activity; (2) that the Defendants took adverse employment action against her; and (3) that there exists a causal connection between the protected activity and the adverse action.  Tran v. Trustees of the State Colleges in Colo., 355 F.3d 1263 (10th Cir. 2004).  Once Plaintiff makes this showing, Defendants must articulate a facially legitimate, nondiscriminatory reason for the adverse employment action.  Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1212 (10th Cir. 2003).  Plaintiff must then respond by showing that the Defendants' asserted reasons for the adverse action are pretextual.  Id.

Defendants assert that Williams engaged in no protected conduct until after she left her employment with W.D. Sports and, thus, cannot establish the essential elements of a claim of retaliation.  Defendants also urge that their statements made to the NMDOL with regard to Williams' claim for unemployment benefits cannot form the basis of a retaliation claim because

those statements are absolutely privileged.  Defendants further argue that, even if statements made

to NMDOL are actionable, they are not in themselves adverse employment actions because

Williams did obtain the unemployment benefits in spite of Defendants' challenge to her claim.

Finally, Defendants argue that Williams' termination cannot be the adverse employment action

supporting her claims of retaliation because she cannot establish that her termination resulted from

any protected activity in that her termination was the result of her insubordination and did not

occur in temporal proximity to any protected conduct.

Filing a charge of discrimination with the EEOC or the New Mexico Human Rights

Division qualifies as protected activity.  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178

(10th Cir.1999).  An employee's complaints about the treatment of others is considered a

protected activity under Title VII anti-retaliation provisions.  Ray v. Henderson, 217 F.3d 1234,

1240 (9th Cir. 2000).  Informal complaints to superiors constitute protected activity for purposes

of a Title VII retaliation action.  O'Neal v. Ferguson Const. Co., 237 F.3d 1248 (10th Cir. 2001).

There is no dispute that Williams filed a charge of discrimination.  Williams' testimony

indicates that she made informal complaints to superiors regarding the treatment of others and

herself.  Accordingly, Williams has shown that she engaged in protected activity.

As previously noted, the Tenth Circuit gives a liberal definition to the term "adverse

employment action."  Sanchez, 164 F.3d at 532.  "The Tenth Circuit has not adopted a set rule

regarding what constitutes an adverse employment action:  rather, this determination is to be

made on a case-by-case basis, examining the unique factors relevant to the situation at hand."

Ward v. Wal-Mart Stores, Inc., 140 F.Supp.2d 1220, 1231 (D.N.M. 2001) (Black, J.) (citing

Anderson, 181 F.3d at 1178; Sanchez, 164 F.3d at 532).  In determining whether an employer's

actions is an "adverse employment action," a court should consider whether the threat of the employer's action would deter victims of discrimination from filing a charge of discrimination. See Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997).

As previously noted, termination of employment is an adverse employment action.[6]  The law is clear that Title VII's anti-retaliation provision applies to former as well as current employees.  Robinson, 519 U.S. at 346; Aquilino v. Univ. of Kan., 268 F.3d 930 (10th Cir. 2001). Thus, the fact that some of the alleged retaliatory conduct occurred after Williams' employment ended does not preclude a claim, and the Court may proceed to analyze whether actions taken by Defendants after Williams' employment ended may be considered adverse employment actions.

Defendants' argument that their statements to the NMDOL are privileged and not actionable Under Title VII and the NMHRA anti-retaliation provisions relies on state common law privileges specific to tort actions for defamation.  Defendants are correct that statements made in administrative proceedings are absolutely privileged and are therefore not actionable in a claim for defamation.  Zuniga v. Sears, Roebuck and Co., 671 P.2d 662, 665 (N.M. App. 1983); Neece v. Kantu, 507 P.2d 447, 453 (N.M. App. 1973).  However, Defendants have offered no legal authority or argument to support application of this state common law privilege to actions under Title VII or even under the NMHRA.  The Court does not believe that the policy considerations underlying the anti-retaliation provisions of Title VII and the NMHRA are served by the common law privileges, and the policy considerations underlying the privileges do not

---

[6]Defendants' Memorandum in Support of their motion for summary judgment connotes that something in Williams' own sworn testimony indicates that her retaliation claim is not based on her termination.  See Docket No. 122 p. 14.  However, Defendants' statement of undisputed material facts do not include anything with regard to such testimony, and Defendants do not reference any such testimony in the body of their brief.

outweigh those underlying Title VII or the NMHRA.  Moreover, the Court knows of no legal grounds for subordinating or preempting a federal claim under Title VII based on a state common law privilege.  Thus, the Court may examine these statement and determine whether they are adverse employment actions for purposes of Williams' retaliation claims.

Defendants' argument that their statements to the NMDOL are not adverse employment actions because Williams ultimately received all the benefits she sought does not raise an issue of first impression in this Court.  In Ward v. Wal-Mart Stores, Inc., 140 F.Supp.2d 1220, 1231 (D.N.M. 2001), a plaintiff was terminated from his employment.  Following his termination, he sought  unemployment benefits and also filed a charge of discrimination.  Less than a month after he filed his charge of discrimination, his former employer challenged his award of unemployment compensation.  U.S. District Judge Bruce Black held that the plaintiff had established a prima facie case of retaliation.  Ward, 140 F.Supp.2d at 1230-31.  In deciding that the employer's challenge to the plaintiff's unemployment compensation could be an adverse employment action, Judge Black noted that several courts have found that the filing of a frivolous lawsuit can be the basis of a retaliation claim because "such suits can create a chilling effect on the pursuit of a discrimination claim.  Id. at 1231 (citing EEOC v. v. R.J. Gallagher Co., 181 F.3d 645 (5th Cir. 1999); EEOC v. Outback Steakhouse of Florida, Inc., 75 F.Supp.2d 756 (N.D. Ohio 1999)).  I agree with Judge Black's analysis and find that Williams has met her burden of showing an adverse employment action, for purposes of summary judgment, by showing that Defendants challenged her right to receive unemployment benefits.

With regard to showing a causal connection between the protected activity and the adverse action, a plaintiff must provide evidence of circumstances that justify an inference of

retaliatory motive.  Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997).  In some cases, such causal connection is shown when the adverse action closely follows the protected conduct.  Id.  However, unless the adverse action is very closely connected in time to the protected activity, a plaintiff must rely on additional evidence beyond mere temporal proximity to show a causal connection.  Id.

Williams has shown a causal connection between her filing a charge of discrimination and the Defendants' challenge to her unemployment benefits.  Defendants' statement to the NMDOL is dated eighteen days after Williams' charge of discrimination was filed.  Williams has failed, however, to show a causal connection between her informal complaints of discrimination and her termination.  She has provided no evidence with regard to the timing of her complaints in relation to her termination.  Nor has she pointed to other evidence justifying an inference that she was terminated in retaliation for her informal complaints of discrimination.  Accordingly, Williams has made a prima facie case of retaliation with regard to Defendants' challenge to her unemployment compensation, but not with regard to her termination.

The burden now shifts to Defendants to articulate a legitimate, nondiscriminatory reason for their actions.  Defendants' motion for summary judgment does not proceed in the McDonnell Douglas analysis beyond arguing that Williams cannot make a prima facie case of retaliation.  Therefore, Defendants have not met their burden at the summary judgment stage and are not entitled to summary judgment with regard to Williams' retaliation claims.

IV.    PLAINTIFF WILLIAMS' CLAIM FOR CIVIL CONSPIRACY IN COUNT XXV AND
       AIDING AND ABETTING IN COUNT XIV

      To establish a claim for civil conspiracy, a plaintiff must demonstrate that (1) a conspiracy between two or more individuals existed; (2) specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) plaintiff was damaged as a result. Ettenson v. Burke, 17 P.3d 440 (N.M. App. 2000). An actionable civil conspiracy must involve a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. Las Luminarias of the New Mexico Council of the Blind v. Isengard, 587 P.2d 444, 447 (N.M. App. 1978). The existence of a civil conspiracy must be pled by direct allegations or by allegations of circumstances from which a conclusion of the existence of a conspiracy may be reasonably inferred. Id. The circumstances, considered as a whole, must create a genuine issue of material fact regarding an agreement among the alleged conspirators. Morris v. Dodge Country, Inc., 513 P.2d 1273, 1274 (Ct. App. 1973).

      The New Mexico Human Rights Act makes it an unlawful discriminatory practice for any person or employer to "aid, abet, incite, compel or coerce the doing of any unlawful discriminatory practice or attempt to do so . . .. N.M. Stat. Ann. 28-1-7(I)(1). No New Mexico cases have interpreted the aiding and abetting aspect of the Human Rights Act. However, New Mexico courts have addressed actions in tort for aiding and abetting others to commit tortious acts. See GMC, Inc. v. Kentucky Central Life Ins. Co., 947 P.2d 143 (N.M. 1997). In GMC, Inc., the New Mexico Supreme Court recognized an action in tort for aiding and abetting a breach of fiduciary duty. In doing so, the court specifically referenced the Restatement (Second) of Torts § 876(b) and stated that, "New Mexico recognizes tort liability for aiding and abetting another's

tortious conduct." GMC, Inc., 947 P.2d at 147.  The Restatement provides that a person is liable for the tortious conduct of another when he knows that the other's conduct is a breach of duty to a third person and he gives substantial assistance or encouragement to the other's conduct, or if he gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.  Restatement (Second) of Torts § 876(a) and (b).

Defendants argue that Williams has no evidence of concerted action among any of the Defendants and thus fails to create a genuine issue of material fact with regard to all of the essential elements of either a civil conspiracy or an aiding and abetting claim.  In response, Williams makes the conclusory statement that, "No single Defendant did this alone.  Defendants' efforts, led by Mr. Frank, have been concerted." See Docket No. 142 p. 23.

On summary judgment, the movant may meet its Rule 56 burden by pointing out to the court that the nonmovant "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23.  Once a movant has met its burden of pointing out that the nonmovant has failed to show the existence of an element essential to her case, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-7 (1986).  To meet her burden, the nonmovant must "designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. The nonmovant cannot satisfy its burden with conclusory allegations.  Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

Williams' conclusory statement in response to Defendants' motion for summary judgment on the civil conspiracy and aiding and abetting claims falls short of meeting Williams' burden of establishing the existence of a genuine issue for trial. Williams made no efforts to designate specific facts showing a genuine issue for trial on each of the elements of a civil conspiracy claim or aiding and abetting claim, and the Court will not comb through the voluminous record in this case searching for evidence to support the claims. Consequently, Defendants are entitled to summary judgment with regard to these claims.

V.      PLAINTIFF WILLIAMS' CONTRACT CLAIMS

Williams' contract claims include a claim for breach of contract in Count nineteen (XIX), a claim for breach of implied contract in Count twenty (XX) and a claim for breach of the covenant of good faith and fair dealing in Count twenty-one (XXI). In her response to the motion for summary judgment, Williams expressly narrows her contract claims to seek recovery only for her unpaid vacation time.

Williams has provided evidence that she received a letter from Dunn in May 2001 indicating she would receive two weeks vacation per year. Even if this letter is construed as a contract, Williams has failed to provide any evidence that W.D. Sports was obligated under contract or otherwise to reimburse her for unused vacation time upon termination of her employment. Accordingly, Williams has failed to meet her burden of providing evidence creating a disputed issue of material fact for trial, and Defendants are entitled to summary judgment with regard to Williams' contract claims.

VI.     PLAINTIFF WILLIAMS' RETALIATORY DISCHARGE CLAIM

In order to succeed on a claim for retaliatory discharge, an employee must show that she was discharged because she performed acts that public policy authorized or encouraged, or because she refused to do something required by her employer that public policy would condemn. See Garrity v. Overland Sheepskin Co. of Taos, 917 P.2d 1382, 1386 (N.M. 1996).

Williams argues that she was fired as soon as she refused to sign a release of claims, and points out that both federal and state law prohibit retaliation against an employee who has filed a charge of discrimination.  Williams argues that this is sufficient to allow her claim of retaliatory discharge to proceed.

Williams was in the process of being fired when she refused to sign the release, and was being offered severance and a written document outlining the reasons for her termination in exchange for the release.  Her refusal to sign the release resulted in her not receiving a written statement of the reasons for her discharge and not receiving any severance.  The facts, even in a light most favorable to Williams, could not support a finding that Williams was fired because she refused to sign the release.  Williams has no other evidence to suggest that she was fired because she performed acts that public policy authorized or encouraged or because she refused to do something required by her employer that public policy would condemn.  Accordingly, Defendants are entitled to summary judgment on Williams' claim for retaliatory discharge in Count twenty-two (XXII).

VII.    PLAINTIFF WILLIAMS' CLAIMS FOR FALSE LIGHT AND DEFAMATION

To establish a claim for defamation, a plaintiff must prove, in part, that (1) the defendant published a communication; (2) the communication was defamatory; (3) the communication

26

contained a statement of fact as opposed to a statement of opinion; and (4) the communication proximately caused damage to the plaintiff's reputation.  N.M. UJI 13-1002.  Defamatory communications are those which tend to expose a person to contempt, harm a person's reputation, or discourage others from associating with the person.  N.M. UJI 13-1007.

False light is a tort that falls within the rubric of the tort of "invasion of privacy." Andrews v. Stallings, 892 P.2d 611, 625 (N.M. App. 1995).  While the elements of an action for false light are not identical to those for defamation, "[f]alse light invasion of privacy is a close cousin of defamation."  Id.  Both torts require a disclosure of factual information.  See Benson v. AJR, Inc., 599 S.E.2d 747, 752 (W.Va. 2004) (delineating the elements of a false light invasion of privacy claim as including a showing a defendant made a public disclosure of facts regarding the Plaintiff).[7]  While a claim of false light does not require a plaintiff to show damage to her reputation, in order to prevail on a claim of false light, a plaintiff must show that the disclosure made by the defendant would be highly objectionable and offensive to a reasonable person of reasonable sensibilities.  See Id.[8]

As already noted, Defendants are correct that statements made in administrative proceedings are absolutely privileged and are therefore not actionable in a claim for defamation. Zuniga v. Sears, Roebuck and Co., 671 P.2d 662, 665 (N.M. App. 1983); Neece v. Kantu, 507 P.2d 447, 453 (N.M. App. 1973).  While New Mexico courts have not specifically addressed

---

[7]New Mexico courts have not specifically addressed the elements of a claim of false light.

[8]The complete list of elements for a claim of false light includes (1) that there was a public disclosure by the Defendant of facts regarding the Plaintiff; (2) that the facts disclosed were private facts; (3) that the disclosure of such facts is highly offensive and objectionable to a reasonable person of reasonable sensibilities; and (4) that the public has no legitimate interest in the facts disclosed).  Benson v. AJR, Inc., 599 S.E.2d 747, 752 (W.Va. 2004).

whether the privileges that foreclose an action in defamation will also foreclose an action for false light invasion of privacy, the court in <u>Andrews</u> noted that other limitations and requirements of a claim for defamation apply equally to a claim for false light invasion of privacy.  <u>See Id.</u> Jurisdictions that have specifically addressed the issue whether the privileges normally associated with defamation claims apply to claims of false light have found in the affirmative.  <u>See Froelich v. Adair</u>, 516 P.2d 993, 996-97 (Kan. 1973) (finding that invasion of privacy torts and defamation torts share the common defense of privileged communications); <u>Crump v. Beckley Newspapers, Inc.</u>, 320 S.E.2d 70, 83 n. 5 (W.Va. 1984) (noting that the same absolute and qualified privilege defenses which are available in defamation actions are also available in right to privacy actions).  I find that the New Mexico courts, if faced directly with the issue, would hold that absolute and qualified privileges are defenses to a claim for false light invasion of privacy.  Accordingly, Williams cannot rely on Defendants' statements to the NMDOL or Defendants' response to Williams' charge of discrimination to bring her claims of defamation and false light.

In addition to Defendants' statement to NMDOL and response to her charge of discrimination, Williams' claims for false light and defamation rely on a statement in a newspaper article referring to Plaintiffs as "disgruntled former employees" and statements allegedly made to hockey patrons that Williams was on vacation after her employment had been terminated.

The New Mexico Uniform Jury Instructions make evident that the issues in a defamation claim of whether a statement is defamatory and whether it is a statement of fact are issues of fact. Because of the close relationship between a claim for defamation and a claim for false light, I find that the issues whether a disclosure is factual and whether it would be highly objectionable and offensive to a reasonable person are also issues of fact.  Therefore, summary judgment on these

bases would be inappropriate unless no reasonable jury could find that the statements are statements of fact, defamatory, or highly objectionable and offensive to a reasonable person.

I further find that no reasonable jury could find that the statement in the newspaper article attributed to Defendant Frank that Plaintiffs were "disgruntled former employees" was a statement of fact. This is clearly a statement of Frank's opinion concerning the Plaintiffs' states of mind. Therefore, this statement cannot be the basis of Williams' defamation or false light claim.

With regard to Defendants' alleged communications to various hockey patrons that Williams was on vacation after she had been terminated, no reasonable jury could find that these communications were defamatory. Nothing about these communications exposes Williams to contempt, could have any tendency to harm Williams' reputation or could discourage others from associating with Williams. Similarly, no reasonable jury could find that these communications would be highly offensive and objectionable to a reasonable person of reasonable sensibilities. Therefore, these communications cannot be the basis of a claim for false light or defamation. Because none of the statements alleged by Williams to be defamatory and to have placed her in a false light can be the basis for these claims, Defendants are entitled to summary judgment with regard to these claims.

## VIII.   PLAINTIFF WILLIAMS' CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendants make three arguments in support of summary judgment on Williams' claim for intentional infliction of emotion distress (IIED). Defendants first urge that the IIED claim is actually an element of damages for Williams' other claims rather than a separate claim. Then, assuming that Williams' other claims fail at the summary judgment stage, Defendants contend that

the IIED damages must also fail.  Second, Defendants argue that, even if the IIED claim is considered a separate claim rather than just a damages component of other claims, it must fail because it is barred by the exclusivity provisions of the New Mexico Worker's Compensation Act. Finally, Defendants contend that Williams has failed to support the claim because the facts do not show sufficiently outrageous behavior for an IIED claim.

Defendants' first two arguments are easily rejected.  There is no legal support for the argument that IIED is a component of damages rather than a distinct legal claim.  While emotional distress is a component of damages for many claims, New Mexico has unequivocally recognized a separate claim for the tort of IIED.  See Dominguez v. Stone, 638 P.2d 423, 426 (N.M. App. 1981).  Defendants' contention that an IIED claim is barred by the exclusivity provision of the Worker's Compensation Act (WCA) is equally without merit.  Injuries caused by sexual harassment do not arise out of employment and are not covered by the WCA.  See Coates v. Wal-Mart Stores, Inc., 976 P.2d 999, 1005 (N.M. 1999).  Accordingly, "the exclusivity provision [of the WCA] does not preclude an employee from seeking a remedy outside the WCA for injuries caused by sexual harassment."  Id.

In order to establish a claim for IIED, a plaintiff must show that (1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the plaintiff's mental distress.  Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 P.3d 333, 342 (N.M. 2001).  Extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable

in a civilized society." Id. (citing Restatement (Second) of Torts § 46 cmt. d).  As a threshold

matter, a trial court must determine whether, as a matter of law, the conduct at issue may

reasonably be regarded as sufficiently extreme and outrageous as to permit recovery under the

tort of IIED.  Id. at 343.  If reasonable persons could differ on the question, the issue whether the

conduct is sufficiently extreme and outrageous is for the jury.  Id.

       In Trujillo, an employee, Mr. Trujillo, sued his employer for IIED after his employment

was terminated.  Mr. Trujillo had worked for the defendant for fifteen years in the billing

department.  An independent audit had revealed record-keeping problems within the business, and

the employer initiated an internal audit to determine the source and extent of billing and record-

keeping errors.  Mr. Trujillo, along with other employees in the billing department, was sent to a

seminar on record-keeping.  During the seminar, Mr. Trujillo became ill.  He was given a

preliminary diagnosis of a serious condition and remained on sick leave for a month.  After a

month, Mr. Trujillo's doctor cleared him to return to work on a part time basis.  When he

returned to work, Mr. Trujillo met with his supervisor to discuss concerns about his work that

had been discovered in his absence.  The supervisor stated that he wanted Mr. Trujillo to work

full time and placed Mr. Trujillo on paid administrative leave. A week later, the employer sent Mr.

Trujillo a letter informing him that his employment was being terminated based on a lack of

confidence in Mr. Trujillo's job performance.  The case went to trial, the IIED claim was

submitted to the jury, and a verdict was returned in Mr. Trujillo's favor.  Trujillo, 41 P.3d at 337.

On appeal, the employer argued that there was insufficient evidence to support the verdict.  Id.

The New Mexico Supreme Court agreed finding that there was no evidence of specific instances

in which the employer's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency.  Id. at 343.

In Coates, two former employees brought IIED claims against Wal-Mart for sexual harassment by a supervisor.  The plaintiffs presented evidence that a supervisor, Mr. Alire, had physically and verbally sexually harassed them.  Mr. Alire made lewd and vulgar suggestions to the plaintiffs on more than one occasion and made an obscene gesture to one of the plaintiffs on at least one occasion.  One incident involved Mr. Alire grabbing one of the plaintiff's breasts from behind while she was operating a forklift.  On another occasion, Mr. Alire pulled open the other plaintiff's blouse to look at her breasts.  The case went to trial, the IIED claims were submitted to a jury, and a verdict was entered in favor of the plaintiffs.  Coates, 976 P.2d at 1002.  Wal-Mart appealed the jury verdict arguing that there was insufficient evidence to support the verdict.  Id. at 1009.  In affirming the verdict, the New Mexico Supreme Court found that Mr. Alire's conduct was outrageous.  Id.[9]

Assuming the facts in a light most favorable to Williams, the egregiousness of the Defendants' conduct is more similar to the conduct at issue in Coates than the conduct at issue in Trujillo.  Unlike Williams, the plaintiff in Trujillo never suffered abusive or foul language and was not yelled at.  The plaintiffs in Coates, like Williams, were subjected to lewd and vulgar suggestions and remarks.  The conduct at issue in Coates is decidedly more extreme and

_____

[9]The New Mexico Supreme Court also held that a reasonable jury could find that Wal-Mart, through its supervisor and management, intentionally allowed the sexual harassment by Mr. Alire with utter indifference to the consequences.  Coates, 976 P.2d at 1009.  The plaintiffs had complained to management of the harassment on several occasions to no avail.  Also, supervisors had witnessed the harassment and had done nothing to intervene.  Id.

outrageous than anything suffered by Williams.  This distinction, however, does not necessarily mandate a conclusion that the conduct of the Defendants was not outrageous.

Defendants' argument for summary judgment on Williams' IIED claim relies on case law from other jurisdictions finding that sexual harassment in the workplace will generally not be sufficiently outrageous to support a claim for intentional infliction of emotional distress or the tort of outrage.[10]  These cases from jurisdictions outside New Mexico do not inform the issue here. New Mexico courts have specifically permitted recovery for IIED in a cases involving workplace harassment.  See Coates, 976 P.2d at 1009-10.

Given that all reasonable factual inferences must be drawn in favor of Williams, the Court cannot conclude, as a matter of law, that the conduct at issue in this case may not be reasonably regarded as sufficiently extreme and outrageous as to permit recovery under the tort of IIED. Accordingly, Defendants are not entitled to summary judgment on Williams' claim of IIED and Defendants' motion with regard to this claim is denied.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment as to All Claims by Rosann Williams [Docket No. 121] is hereby GRANTED IN PART as follows:

1.  Judgment is GRANTED in favor of Defendants on Plaintiff Williams' claim under the Equal Pay Act in Count eighteen (XVIII).

2.  Judgment is GRANTED in favor of Defendants on Plaintiff Williams' claim for intentional interference with a business advantage in Count twenty-six (XXVI).

---

[10]New Mexico courts have recognized that the tort of IIED is also known as the tort of outrage.  Padwa v. Hadley, 981 P.2d 1234, 1237 (N.M. App. 1999).

3.    Judgment is GRANTED in favor of Defendants on Plaintiff Williams' claim for sexual harassment under Title VII in Count seven (VII).

4.    Judgment is GRANTED in favor of Defendants on Plaintiff Williams' claim for sexual harassment under the New Mexico Human Rights Act in Count ten (X).

5.    Judgment is GRANTED in favor of Defendants on Plaintiff Williams' claim for civil conspiracy in Count twenty-five (XXV).

6.    Judgment is GRANTED in favor of Defendants on Plaintiff Williams' claim for aiding and abetting under the New Mexico Human Rights Act in Count fourteen (XIV)

7.    Judgment is GRANTED in favor of Defendants on Plaintiff Williams' claim for breach of contract in Count nineteen (XIX).

8.    Judgment is GRANTED in favor of Defendants on Plaintiff Williams' claim for breach of implied contract in Count twenty (XX).

9.    Judgment is GRANTED in favor of Defendants on Plaintiff Williams' claim for breach of the implied covenant of good faith and fair dealing in Count twenty-one (XXI).

10.    Judgment is GRANTED in favor of Defendants on Plaintiff Williams' claim for retaliatory discharge in Count twenty-two (XXII).

11.    Defendants' Motion is GRANTED in favor of Defendants on Plaintiff Williams' claim for false light in Count twenty three (XXIII).

12.    Judgment is GRANTED in favor of Defendants on Plaintiff Williams' defamation claim in Count twenty-four (XXIV).

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment as to All Claims by Rosann Williams [Docket No. 121] is hereby DENIED IN PART as follows:

13. Defendants' Motion is DENIED with regard to Plaintiff Williams' claim for disparate treatment under Title VII in Count six (VI).

14. Defendants' Motion is DENIED with regard to Plaintiff Williams' claim for disparate treatment under the New Mexico Human Rights Act in Count nine (IX).

15. Defendants' Motion is DENIED with regard to Plaintiff Williams' hostile work environment claim under Title VII in Count eight (VIII).

16. Defendants' Motion is DENIED with regard to Plaintiff Williams' hostile work environment claim under the New Mexico Human Rights Act in Count eleven (XI).

17. Defendants' Motion is DENIED with regard to Plaintiff Williams' claim for retaliation under Title VII in Count twelve (XII).

18. Defendants' Motion is DENIED with regard to Plaintiff Williams' claim for retaliation under the New Mexico Human Rights Act in Count thirteen (XIII).

19. Defendants' Motion is DENIED with regard to Plaintiff Williams' claim for intentional infliction  of emotional distress in Count seventeen (XVII).

_____

UNITED STATES DISTRICT JUDGE